747 F.2d 209
 Fed. Sec. L. Rep. P 91,829
Mary A. BIECHELE, Executrix of the Estate of Dallas J.
Biechele, Deceased; Linda A. Mitchell; Margaret
Nickles; and Charles Nickles,
Plaintiffs-Appellants,
v.
CEDAR POINT, INC.; S. Pearson and Son Limited; Whitehall
Holdings Limited; Lazard Freres & Co.; Paul A. Dunn;
Marvin Johnson; Emil A. Legrros, Jr.; Robert L. Munger,
Jr.; James S. Reid, Jr.; George A. Roose; Richard S.
Sheetz; Carl C. Tucker, Defendants-Appellees.
 No. 83-3389.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 17, 1984.
Decided Nov. 8, 1984.
 
 Dennis E. Murray, Kirk J. Delli Bovi (argued), Murray & Murray Co., Sandusky, Ohio, for plaintiffs-appellants.
 John E. Beerbower (argued), Cravath, Swaine & Moore, New York City, Thomas P. Mulligan, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Edwin E. McAmis/Jerome S. Hirsch (argued), New York City, for defendants-appellees.
 Before LIVELY, Chief Judge; ENGEL, Circuit Judge; and CELEBREZZE, Senior Circuit Judge.
 LIVELY, Chief Judge.
 
 
 1
 This is an appeal by plaintiffs, shareholders and former shareholders of Cedar Point, Inc., an Ohio corporation (Cedar Point) from judgment for the defendants in an action claiming violation of federal securities laws. The complaint also contains pendent claims based on Ohio law relating to the fiduciary duties of corporate directors. The defendants are Cedar Point, its directors, two English corporations, S. Pearson and Son Limited and Whitehall Holdings Limited (hereafter collectively Pearson) and Lazard Freres & Co., advisor to Cedar Point. Lazard Freres & Co. was dismissed prior to final judgment and the plaintiffs do not argue that this action of the district court was erroneous.
 
 I.
 A.
 
 2
 Cedar Point operates amusement parks in Sandusky, Ohio and Shakopee, Minnesota. At all times material to this litigation Cedar Point common stock was registered with the Securities and Exchange Commission (SEC) and traded on the over-the-counter market.
 
 
 3
 In 1977 MCA, Inc., an entertainment company, expressed interest in merging with Cedar Point. Cedar Point was not enthusiastic about a merger with MCA, and the two meetings that were held did not result in any agreement. In July 1978 MCA announced that it had acquired five per cent of Cedar Point's stock in open-market purchases. In November 1978 MCA acquired another substantial block of stock through a privately-negotiated purchase. After that purchase, MCA owned 9.58 per cent of the Cedar Point common shares.
 
 
 4
 On December 3, 1979 MCA announced that it would make a tender offer for an additional 11 per cent of the Cedar Point shares at $30.10 per share. The Cedar Point board of directors opposed this offer as inadequate, and retained Kidder, Peabody & Co. (Kidder Peabody) "to explore the financial alternatives available to Cedar Point shareholders." No shares had been tendered when the MCA offer expired on January 10, 1980, apparently because the shares had been trading above the MCA offering price.
 
 
 5
 As part of its investigation of the financial alternatives to MCA's offer, Kidder Peabody prepared a report dated December 17, 1979, which contained, among other information, cash flow projections through 1984. The report was intended to be given to the 40 or 50 companies Kidder Peabody had contacted as potential buyers of all the Cedar Point stock, but apparently only about a dozen of those potential buyers were actually furnished a copy. None of the contacts, including one with Pearson, proved successful.
 
 
 6
 Pearson nevertheless was interested in acquiring a stake in Cedar Point. Representatives from Cedar Point and Pearson met together in "get-acquainted" sessions in March and April 1980. Internal Pearson memoranda indicated that a purchase price of $36-$40 per share was seen as within an acceptable range. By June, Pearson was clearly attracted to the possibility of acquiring what it saw as "definitely under-priced" Cedar Point stock.
 
 
 7
 In July 1980 Pearson bought 4,000 shares of Cedar Point stock on the open market. Pearson also conducted negotiations with MCA, which had retained the Cedar Point shares it acquired in 1978. On August 21, 1980 Pearson purchased MCA's block of 313,615 shares at a price of $34.95 per share. As part of the purchase agreement Pearson agreed to pay MCA additional compensation if it should sell the shares it had purchased from MCA, or should tender for additional shares at an offering price higher than that it had paid for MCA's shares, within one year of the purchase from MCA (the Add-on agreement). The additional compensation was to be calculated according to a formula agreed to be MCA and Pearson.
 
 
 8
 Pearson filed a Schedule 13D with the SEC, which described the Add-on agreement, and to which was appended a copy of the purchase agreement. Pearson's purchase of the shares held by MCA was reported in news stories in which the Add-on agreement was mentioned, in the New York Times, Wall Street Journal, and Sandusky Register. After the MCA purchase Pearson owned about 9.7 per cent of the Cedar Point stock.
 
 
 9
 Pearson and Cedar Point continued to negotiate. On February 26, 1981 they executed an agreement whereby Pearson expressed its intention to make a tender offer for up to 15.3 per cent of the Cedar Point common shares. As part of the agreement Pearson agreed that for a period of five years it would not acquire in excess of 30 per cent of Cedar Point stock, absent circumstances involving a potential change in control of Cedar Point (the Standstill agreement).
 
 
 10
 On February 26, 1981 Pearson announced its tender offer for 15.3 per cent of the total Cedar Point shares. The Standstill agreement was attached to the Schedule 14D-1 which Pearson filed with the SEC. Cedar Point filed its Schedule 14D-9 with the SEC, and it also described the Standstill agreement. The plaintiffs assert that copies of the Standstill agreement were not provided to Cedar Point shareholders, but Pearson's offer to purchase and the Schedule 14D-9 were disseminated to them.
 
 B.
 
 11
 Mary Biechele and three other named plaintiffs filed a class action complaint on March 27, 1981 on behalf of themselves and other Cedar Point shareholders. This was four days before the Pearson tender offer expired. The plaintiffs alleged violations of sections 10(b)[1] and 14(e)[2] of the Securities Exchange Act of 1934, and of Rule 10b-5[3] of the SEC, and also breach of fiduciary duty under state law.
 
 
 12
 A motion for a temporary order restraining Pearson from purchasing any additional tendered shares was granted on April 1, 1981. Plaintiffs' motion for a preliminary injunction against the consummation of Pearson's tender offer was denied on April 13, 1981, however, because the district court found that plaintiffs had failed to satisfy both the "irreparable harm" and "likelihood of success on the merits" requirements for issuance of such an order. See Mason County Medical Ass'n v. Knebel, 563 F.2d 256, 261 (6th Cir.1977).
 
 
 13
 In May 1981 the defendants moved for dismissal or, alternatively, summary judgment. The plaintiffs filed affidavits and, after this court's decision in Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.1981), a third supplemental memorandum in opposition to defendant's motions. In November 1982 the district court granted defendants' motions in part and denied them in part. The federal claims remaining were based on the plaintiffs' assertions that the Standstill and Add-on agreements were manipulative devices under Mobil, and that the defendants had failed to disclose these agreements in violation of sections 10(b) and 14(e) and Rule 10b-5.
 
 C.
 
 14
 The defendants moved for reargument and reconsideration, contending that they had not had an opportunity to address the grounds upon which the court had relied, i.e., Mobil, and the motion was granted. The district court then reversed its earlier rulings and held that neither of the agreements at issue constituted a manipulative device, and granted summary judgment for the defendants; the state law claims were dismissed.
 
 
 15
 The district court found that no genuine issue of material fact existed as to the plaintiffs' claim that they relied on Pearson's nondisclosure of the Add-on agreement with MCA in making their decisions with respect to Pearson's tender offer. The record clearly showed, according to the district court, that the plaintiffs had knowledge of the facts concerning the agreement before they filed suit, which occurred prior to expiration of the tender offer and prior to the plaintiffs' making their decisions in response to Pearson's tender. This conclusion was supported by references to the provisions of the Add-on agreement in the complaint. Further, in depositions, the plaintiffs Charles Nickles and Linda Mitchell had testified that they did not rely on information disseminated with the tender offer in making their decisions, and counsel for the plaintiffs stated that the other named plaintiffs had not relied on such information. On the basis of this statement, depositions of the other plaintiffs previously noticed by the defendants were cancelled. Given these facts, the district court held that subsequent affidavits of the plaintiffs claiming reliance on the allegedly omitted details of the Add-on agreement, filed in opposition to motions for summary judgment, did not create a genuine issue of material fact.
 
 
 16
 The district court also held the defendants had no duty under sections 10(b), 14(e) or Rule 10b-5 to make disclosures beyond those shown in the record with respect to the Add-on and Standstill agreements. In dismissing the pendent state law claims the district court held that federal securities laws do not provide relief for mere breach of fiduciary duties of Cedar Point directors. Having concluded that the defendants were entitled to judgment on the claims of federal securities law violations, the district court exercised its discretion and dismissed the pendent claims.
 
 II.
 
 17
 The plaintiffs raise four issues on appeal:
 
 
 18
 A. Whether the district court erred in holding, as a matter of law, that the Add-on agreement was not a manipulative device and that plaintiffs had not relied upon the nondisclosure of the Add-on agreement to their detriment.
 
 
 19
 B. Whether the district court erred in holding, as a matter of law, that the Standstill agreement was not a manipulative device forbidden by the securities laws.
 
 
 20
 C. Whether the district court erred in dismissing plaintiffs' claims based upon nondisclosure of the 1979 Kidder Peabody report.
 
 
 21
 D. Whether the district court erred in dismissing plaintiffs' state-law breach of fiduciary duty claims.
 
 
 22
 The Securities Exchange Act of 1934 was amended in 1968 by passage of the Williams Act, Pub.L. 90-439, 82 Stat. 454, which added section 14(e). The plaintiffs argue and the defendants agree that the Williams Act is intended to protect investors confronted with tender offers by ensuring that they not be required to respond to such offers without adequate information. The plaintiffs contend that the terms of the Add-on agreement were material to Cedar Point shareholders confronted with Pearson's tender offer and thus its disclosure was required. They also assert that the agreement was a manipulative device, relying primarily on this court's decision in Mobil. The Add-on agreement was a manipulative device, the plaintiffs say, because it created a barrier to tender offers at a higher price than Pearson's and established an artificial offering price. Finally, the plaintiffs argue, the district court erred in concluding that they had failed to present a genuine issue of fact with their claim that they relied on nondisclosure of the Add-on agreement in making their decisions concerning the tender offer. They rely in part on a presumption of reliance in nondisclosure cases articulated by the Supreme Court in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), where the Court, 406 U.S. at 153-54, 92 S.Ct. at 1472, wrote:
 
 
 23
 Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (CA2 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); 6 L. Loss, Securities Regulation 3876-3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud--SEC Rule 10b-5, Secs. 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. Chasins v. Smith, Barney & Co., 438 F.2d [1167] at 1172 [ (1970) ].
 
 A.
 
 24
 Turning first to the claim that the Add-on agreement was a manipulative device, we agree with the district court that it was not. This court cautioned that Mobil was an unusual case and that its holding was not to be broadened and applied indiscriminately. 669 F.2d at 377. We find in the present case none of the elements which led us to conclude that two options given by Marathon Oil to U.S. Steel were manipulative devices. When those options were given, Mobil and U.S. Steel were engaged in an "auction for control" of Marathon. The options so affected the bidding as to inhibit Mobil and any other prospective bidder from staying in the arena with U.S. Steel. In the present case, Pearson was the only bidder for Cedar Point stock at the time it entered into the agreement with MCA. Furthermore, Pearson was not seeking control of Cedar Point; its tender offer was for only 15 per cent of the stock. Finally, the fact that Pearson had agreed to pay MCA an additional amount for stock already purchased from MCA if certain contingencies occurred would not affect the price which a third person might be willing to offer for the remaining Cedar Point stock. The Add-on agreement did not create artificial barriers to the operation of the market place or "artifically affect[ ] market activity in order to mislead investors...." Sante Fe Industries, Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).
 
 B.
 
 25
 The district court did not rule directly on the materiality of the Add-on agreement. The plaintiffs argue that the agreement was material to their decisions, and this being so, they were entitled to a presumption of reliance. In TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976), the Supreme Court stated that materiality is an objective matter, "involving the significance of an omitted or misrepresented fact to a reasonable investor." The Court went on to define the standard of materiality best suited to the policies of Rule 14a-9, which relates to the solicitation of proxies, as follows:
 
 
 26
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with Mills' general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 27
 Id. 430 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted). This definition has been applied to tender offer cases as well. See Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 50, 97 S.Ct. 926, 953, 51 L.Ed.2d 124 (1977).
 
 
 28
 The tender offer which Pearson actually made did not trigger the Add-on agreement because the offer price was not higher than the price paid to MCA. Thus, it is difficult to see how a reasonable investor, determining whether to accept the Pearson tender, would have been influenced by knowledge that if the offer from Pearson had been higher than it actually was, Pearson would be obliged to make an additional payment to MCA.
 
 C.
 
 29
 Assuming materiality of the Add-on agreement for purposes of decision only, however, we find that the record fully supports the conclusion of the district court that there was no reliance on the allegedly undisclosed Add-on agreement here. In fact, there was no reliance on any of the tender offer materials which were disseminated. The presumption of reliance set forth in Affiliated Ute is not irrebuttable. Rather, it has been described as "essentially a rule of judicial economy and convenience designed to avoid the impracticality of requiring that each plaintiff shareholder testify concerning the reliance element." Panter v. Marshall Field & Co., 646 F.2d 271, 284 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). This court held in Chelsea Associates v. Rapanos, 527 F.2d 1266, 1271 (6th Cir.1975), that the rule of Affiliated Ute does not prohibit dismissal of an action brought pursuant to section 10(b) and Rule 10b-5 when a court finds no reliance on the nondisclosed fact. While positive proof of reliance is not required for recovery in a nondisclosure case, if the defendant is able to prove that there clearly was no reliance, nondisclosure cannot be said to be the cause of subsequent loss.
 
 
 30
 Until the plaintiffs responded to Pearson's motion for summary judgment, there was nothing in the record to support a claim that the plaintiffs relied on the alleged nondisclosure of the Add-on agreement in making their decisions in response to the tender offer. In fact, the record was completely to the contrary. As the district court stated in its memorandum opinion, the record disclosed that "the plaintiffs had knowledge of the facts concerning the Pearson/MCA agreement prior to initiation of the lawsuit, prior to the expiration of the tender offer, and prior to their decisions concerning the tender offer." In their complaint, filed four days before expiration of the tender offer, plaintiffs described the Add-on agreement as one "pursuant to which the purchase price Pearson paid MCA for the Cedar Point securities Pearson purchased from MCA could be increased from thirty-four and 95/100 dollars ($34.95)." Thus, it is clear the plaintiffs knew of the Add-on agreement and of its principal provision before they were required to make their decisions despite their claims to the contrary in the court. It defies logic to say that, knowing this much about the agreement, their decision was adversely affected by Pearson's failure to distribute the entire agreement to them.
 
 
 31
 The record also discloses that the depositions of two of the named plaintiffs and their attorney's representation with respect to the other two showed unequivocally that none of them relied on the tender offer materials in making their decisions. These decisions were made either on the basis of their own knowledge about Cedar Point, their attorney's advice or totally unrelated considerations such as family ties. The plaintiffs attempted to contradict this testimony and the stipulation with their affidavits which were filed only after the defendants had moved for dismissal or summary judgment. They now claim that the affidavits created a genuine issue of material fact and that summary judgment was therefore improper. We agree with the district court; there was no genuine issue of material fact as to reliance. The court in Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2nd Cir.1969), stated:
 
 
 32
 If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.
 
 
 33
 We conclude that it would be wrong to apply a presumption of reliance on alleged nondisclosure in the face of the record in this case. The plaintiffs knew the essence of the Add-on agreement before the tender offer expired and they testified that their decisions were not based on the disseminated tender offer materials. The fact that this suit was filed as a class action did not require the district court to withhold summary judgment on this issue because some other members of the putative class might claim reliance, since the plaintiffs never moved to have the class certified and no evidence was presented that the requirements of Rule 23, Fed.R.Civ.P., were met.
 
 III.
 
 34
 The plaintiffs assert that reference to the Standstill agreement were "buried" in the tender offer materials disseminated to Cedar Point shareholders and that the filings of Pearson and Cedar Point with the SEC did not satisfy the disclosure requirements of the securities laws. They claim in their brief that the agreement was a manipulative device which "served to 'lock up' Pearson's holding, blocking normal, healthy trading activity and artifically and adversely affecting the price of CP securities." Again, we believe the plaintiffs are straining to apply Mobil, which concerned two true "lock up" options to an agreement which has no such effect. The district court properly rejected the claims of the plaintiffs that the agreement was a manipulative device. Cf. Marshall Field & Co. v. Icahn, 537 F.Supp. 413, 422 (S.D.N.Y.1982) (an agreement similar to the Standstill agreement in the present case held not a manipulative device justifying a restraining order in a tender offer case).
 
 
 35
 The Standstill agreement fixed no price for any future purchases of Cedar Point stock by Pearson or anyone else. Nor did it grant Pearson or anyone else an option or other right to acquire any of Cedar Point's assets or any Cedar Point stock. There were no competing bidders for the minority interest in Cedar Point which Pearson sought. While the agreement had the practical effect of keeping Pearson in a minority position and thus conditionally ensuring continued control by Cedar Point's board of directors, it would not inhibit third party bidders if they were otherwise interested. It guaranteed that Pearson would not be able to obtain majority ownership by piecemeal offers. The agreement provided that if Pearson should decide to make a new tender offer to defeat a rival bidder it would be required to offer to purchase all outstanding Cedar Point stock. The effect of the agreement would be to encourage, rather than inhibit, competitive bidding. Failure to disseminate the Standstill agreement did not violate section 10(b), section 14(e) or Rule 10b-5.
 
 IV.
 
 36
 The Kidder Peabody report was 15 months old at the time of Pearson's tender offer. It had been prepared as a "selling document" to induce other bidders when Cedar Point was trying to fend off MCA's bid for control. The plaintiffs argue that Pearson's possession of the report while other shareholders were denied its contents gave Pearson an unfair advantage over other shareholders. The problem with this position is that the Kidder Peabody report contained projections and speculative assumptions which were little more than predictions of future business success. One approach to valuing Cedar Point stock which was discussed in the report was replacement cost of physical assets. Such valuation could be misleading if disseminated to shareholders, since it would vary from balance sheet information prepared according to accepted accounting principles.
 
 
 37
 The tender offer materials which were disseminated to the plaintiffs disclosed the actual financial results of Cedar Point's operations during the two preceding fiscal years. Further, Cedar Point filed with the SEC a Schedule 14D-9 which was distributed to its shareholders. This schedule contained the recommendation that shareholders interested in disposing of Cedar Point stock for cash accept the Pearson tender offer and gave reasons for the recommendation; it disclosed all information required of a "target" company.
 
 
 38
 The plaintiffs have cited no case in which a court has held that failure to disclose a document such as the Kidder Peabody report violates the federal securities laws. In Arber v. Essex Wire Corporation, 490 F.2d 414 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974), this court held that section 10(b) only requires disclosure of material existing facts and an "insider" is not required to volunteer any economic forecasts. Mere speculation may not be the basis of section 10(b) liability. See also Marsh v. Armada Corp., 533 F.2d 978, 987 (6th Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977) ("[t]he failure to make a projection of future earnings of an acquired company in a merger proxy statement is not actionable under Rule 10b-5."). The district court properly dismissed the claims predicated on failure to disclose the Kidder Peabody report.
 
 V.
 
 39
 The district court dismissed the pendent claims based on Ohio law against Cedar Point and its directors. The decision whether to exercise pendent jurisdiction is committed to the discretion of the trial court. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). It is not an abuse of discretion for a district court to dismiss pendent state claims after resolving all issues raised in the primary federal question claims, and the plaintiffs do not argue to the contrary. Rather, they urge this court to reinstate the pendent claims after reversing the district court's disposition of the federal claims. When an appellate court finds that all federal claims in a case should be dismissed, determination of whether to dismiss pendent state law claims is left to the discretion of the district court. Melamed v. Lake County National Bank, 727 F.2d 1399, 1404 (6th Cir.1984). The district court did not abuse its discretion. Furthermore, we were advised during oral argument that many of the issues raised in this case are also contained in an action which is now pending in the state courts of Ohio between several of the plaintiffs and these defendants.
 
 CONCLUSION
 
 40
 A study of the entire record convinces us that the plaintiffs have tried to clothe their dissatisfaction with their treatment at the hands of Pearson and Cedar Point in language that will bring this action within the purview of federal securities laws. In doing so they have relied on clearly distinguishable decisions. As this court stated in Marsh v. Armada Corp., 533 F.2d at 987, where complaining shareholders have stated "claims under which a court could find only violations of fiduciary duties" they have not established federal question jurisdiction and their complaint is subject to dismissal. Without in any manner indicating a view on the merits of the plaintiffs' state law claims, we conclude that the district court properly dismissed all claims upon determining that the defendants were entitled to judgment on the claims brought pursuant to federal securities laws.
 
 
 41
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Section 10(b) of the Act, 15 U.S.C. Sec. 78j(b) (1982), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 
 [2]
 Section 14(e) of the Act, 15 U.S.C. Sec. 78n(e) (1982), provides:
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.
 
 
 [3]
 Rule 10b-5, 17 CFR Sec. 240.10b-5 (1982), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.