**HOWING COMPANY, et al., Plaintiffs,**

v.

**NATIONWIDE CORPORATION, et al., Defendants.**

**Belle EFROS, Plaintiff,**

v.

**NATIONWIDE CORPORATION, et al., Defendants.**

Nos. C–1–83–1693, C–2–82–1385.

United States District Court,
S.D. Ohio, W.D.

Oct. 18, 1985.

William R. Jacobs, Douglas G. Cole, Cincinnati, Ohio, for plaintiffs Howing Co., et al.

Kenneth R. Cookson, Columbus, Ohio, Gene Mesh, Cincinnati, Ohio, for plaintiff Efros.

Frederick J. McGavran, Cincinnati, Ohio, Jeffrey Davidson, Daniel Attridge, John Whatley, Kirkland & Ellis, Washington, D.C., for defendants.

## OPINION AND ORDER

SPIEGEL, District Judge.

### PROCEEDINGS

This matter came on for consideration and decision on the oral arguments of the parties on defendants' motion for summary judgment (doc. 95), with exhibits attached,

defendants' corrected memorandum in support (doc. 96), plaintiffs' cross-motion for partial summary judgment (doc. 99), and memorandum in opposition to defendants' motion for summary judgment (doc. 100), with exhibits, defendants' reply memorandum in support of their motion for summary judgment (doc. 103), plaintiffs' supplemental memorandum in support of their motion for partial summary judgment and *contra* defendants' motion for summary judgment (doc. 105), which we granted leave to plaintiffs to file at the oral arguments held on September 30, 1985, defendants' supplemental memorandum in support of their motion for summary judgment (doc. 106), and supplemental memorandum of plaintiffs regarding issues of exclusivity of appraisal proceedings (doc. 107).

## FACTUAL BACKGROUND

In this litigation, plaintiffs challenge the 1983 merger between Nationwide Corporation (Nationwide Corp.) and First Plaza Corporation (First Plaza), in which Nationwide Corp. became solely owned by Nationwide Mutual Insurance Corp. (Nationwide Mutual) and its affiliate Nationwide Mutual Fire Insurance Company (Nationwide Fire). The shares of Class A common stock of Nationwide Corp. were converted under the terms of the merger into the right to receive $42.50 per share in cash, or the fair cash value thereof, under Section 1701.85, O.R.C.

The corporate structure of defendants is as follows: Nationwide Mutual was the owner of 85.6% of the outstanding Class A common shares of Nationwide, and Nationwide Mutual and Nationwide Mutual Fire Insurance Company owned 100% of the outstanding Class B common shares of Nationwide. The public owned the remaining 14.4% of the outstanding Class A common shares of Nationwide. Nationwide Mutual is the parent of a number of subsidiary corporations, including Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Michigan Life Insurance Company, West Coast Life Insurance Company, Gulf Atlantic Life Insurance Company, and National Casualty Company.

Nationwide Mutual is engaged in the business of holding substantial or controlling stock interests, primarily in life insurance and financial service corporations.

Nationwide's proxy statement of December 9, 1982 accurately recounts the history of the proposed merger:

In September, 1982, certain officers of Nationwide Mutual informally approached the President of the Corporation proposing the transaction. They discussed the general terms of the possibility of an acquisition by Nationwide Mutual of the remaining publicly held Class A common shares of the corporation for cash. They also proposed affecting a similar acquisition with respect to the outstanding publicly held shares of stock of Nationwide Life, the principal operating subsidiary of the Corporation.... In each transaction, Nationwide Mutual proposed that the public shareholders would receive cash for their shares. The president subsequently contacted the two other members of the executive committee of the Board of Directors of the Corporation who were not directors, officers, or employees of Nationwide Mutual or Nationwide Mutual Fire. The President reported on his discussions concerning the proposal. Following their preliminary discussions, those unaffiliated members of the corporation's Executive Committee retained independent legal counsel to advise them in respect of the proposal and to represent the interest of the public shareholders of the Corporation.

At a special meeting of the directors held on November 2, 1982, the directors of the Corporation were advised that on the following day the Investment Committee of Nationwide Mutual's Board of Directors would recommend to its full Board, and Nationwide Mutual's Board of Directors would consider, a proposal which, if made and accepted, would provide for the merger of the corporation and First Plaza, newly created, wholly owned subsidiary of Nationwide Mutual. As part

of the proposal, the corporation would become a wholly owned subsidiary of Nationwide Mutual and Nationwide Mutual Fire, and the corporation's public shareholders would receive $42.50 per share in cash for the Class A common shares. The Corporation's directors were advised that the price to be paid to the public shareholders for their shares had been set by Nationwide Mutual's Investment Committee to reflect a fair value thereof as determined by the First Boston Corporation ("First Boston").

Immediately thereafter, the Board of Directors of the Corporation appointed a special Evaluation Committee, consisting of the corporation's five Class A Directors who are neither directors, officers, nor employees of Nationwide Mutual or Nationwide Mutual Fire, nor employees of the Corporation, to consider the proposal and to make a recommendation in respect thereof to the full board. The Evaluation Committee was given full authority to hire any professional advisers which it deemed necessary to fulfill its responsibility.

The Evaluation Committee then met that morning to consider engagement of independent counsel to represent the interests of the public shareholders and to advise the Evaluation Committee in respect to the proposed merger. The Evaluation Committee determined to retain the special counsel previously engaged to advise the unaffiliated members of the Executive Committee in respect of the proposal, and immediately thereafter met with such independent counsel to consider the proposal. Counsel advised the members of the Evaluation Committee of their fiduciary responsibilities to the public shareholders, and recommended that the Evaluation Committee meet with representatives of First Boston to consider the adequacy of the price from a financial point of view. Counsel also advised the Evaluation Committee of the need to consider, and the Evaluation Committee considered the statements of officers of both the corporation of Nationwide Mutual in respect of the existence of a prop-

er business purpose for such a transaction.

On the afternoon of November 2, 1982, the Evaluation Committee met with representatives of First Boston, who at that time reported to the members of the Evaluation Committee that in First Boston's opinion, the proposed price of $42.50 per share was fair to the public shareholders of the corporation from a financial point of view.... After further consultation with counsel in respect of the proposal, and after reviewing in detail the report of First Boston in respect of the fairness of the proposed price, and discussing with representatives thereof the terms of its engagements and the scope of its opinion, the Evaluation Committee determined to recommend to the full Board of Directors of the Corporation that the Corporation accept Nationwide Mutual's proposals made on the terms presented to the Evaluation Committee.

On the following day, November 3, 1982, the Board of Directors of the Corporation met in joint session with the Boards of Directors of Nationwide Mutual and Nationwide Mutual Fire, and Nationwide Mutual formally presented the proposal to the Corporation.... The joint session was addressed by representatives of First Boston in respect of the proposed price payable to the public shareholders of the Corporation for their Class A Common shares... Upon review of the report of the First Boston at the joint session, and based upon the recommendation of the Evaluation Committee in respect of the proposal, the Board of Directors of the corporation unanimously voted to enter into an agreement merger with First Plaza, a wholly-owned subsidiary of Nationwide Mutual, whereby the corporation would become solely owned by Nationwide Mutual and Nationwide Mutual Fire, and the public shareholders of the Corporation would receive $42.50 in cash for their Class A Common shares. Pursuant thereto, the Corporation, Na-

tionwide Mutual, and First Plaza entered into the agreement of merger. (doc. 95, Exhibit A, pp. 9 and 10). When the proposed merger was publicly announced on November 3, 1982, the closing bid price of the previous day for the Class A common shares was $28 per share. The merger price of $42.50 represented a premium of 51.8% over the market price, and the merger price was equal to 106% of the June 30, 1982 per share book value of $40.20 and 12.1 times the previous 12 months per share earnings at $3.51.

The proxy materials were distributed to approximately 4,000 public stockholders on December 9, 1982, describing the history and purpose of the proposed transaction, and the action taken by the First Boston and the Evaluation Committee, and contained extensive Nationwide financial information. The materials notified the stockholders of the special meeting to be held January 18, 1983 for the purpose of voting on the merger, and also notified the stockholders of the right to seek judicially determined fair cash value under Ohio Revised Code § 1701.85. Mrs. Efros filed her complaint against Nationwide on November 9, 1982 a preliminary injunction which was denied on January 14 (docs. 16 and 17) and Findings of Fact and Conclusions of Law filed on January 17, 1983 (doc. 20 and 21). Following the denial of Mrs. Efros' motion for a preliminary injunction, the merger was approved by Nationwide public stockholders at the January, 1983 meeting with 94.7% of the voted public shares favoring the merger. None of the named plaintiffs in this litigation participated in the balloting, nor did any shareholder elect to proceed in the Ohio courts to determine the fair cash value pursuant to the remedies available in Section 1701.85 of the Ohio Revised Code.

## QUESTIONS PRESENTED

The complaints filed by Mrs. Efros, the Howing Company, and Douglas McClellan, allege that Nationwide has violated the Federal Securities Law by making false and misleading statements in its announcement of the proposed merger. The defendants have vigorously denied them.

The pleadings, cross-motions for summary judgment, and the oral arguments of the defendants contend that plaintiffs' position does not present a cognizable claim under the Federal Securities Laws. Defendants argue that Nationwide Corp.'s materials contain no material misrepresentation or omissions required under the Federal Securities Laws, that since there has been full disclosure by defendants, plaintiffs' claim that the merger was unfair is not a cognizable claim under the Federal Securities Laws, that the issue of fairness actually relates to the adequacy of the price per share, and that if plaintiffs were dissatisfied with the price, the only available remedy was that provided by Ohio Revised Code Section 1701.85 for judicially determined fair cash value. Finally, defendants contend that there is no evidence of any breach of fiduciary duty owed plaintiffs by defendants, and since, under Ohio corporation law the merger was neither unauthorized by statute, illegal, nor ultra vires, Ohio statutory appraisal rights constituted plaintiffs' exclusive state law remedy.

Plaintiffs, in opposition to defendants' motion for summary judgment contend that there are genuine issues of material fact relating to the determination and fairness of the merger price, and in support of their motion for partial summary judgment, argue that the proxy statement of Nationwide failed to meet the disclosure requirements imposed by Rule 13e–3, 17 C.F.R. § 240.13e–3. Specifically, they contend that the proxy statement failed to disclose the detriments and benefits resulting from the merger, failed to disclose the reasons for the timing of the transaction, failed to comply with the requirements of Rule 13e–3 that the fairness of the merger be discussed in reasonable detail, failed to address all material factors relating to value, and that there was an inadequate discussion of the market price and the First Boston's opinion.

At oral argument, the parties agreed that there really are no contested issues of

fact, and that the disposition of this litigation can be decided on what has been filed with the Court in support of the cross-motions for summary judgment.

## DECISION

■ We begin our analysis by recognizing that Rule 13e–3 promulgated pursuant to Section 13 of the Act establishes the standard of conduct that must be met by an issuer in this type of transaction. What we have here is a freeze-out merger. Rule 13e–3 relates to going private transaction by certain issuers or their affiliates. The disclosure requirements in a freeze-out merger proxy statement are more extensive than those in other types of proxies as noted by Judge Merritt in *Radol v. Thomas*, No. 772 F.2d 244 (6th Cir.1985). Judge Merritt notes:

> The more extensive legal disclosure requirements which apply to freeze-out merger proxy statements are therefore justified by the fact that the law has given the majority the power to foreclose the ownership rights of the minority and has thereby eliminated the market as a correcting mechanism, leaving minority shareholders with only the option of dissent and appraisal, an option which cannot rationally be exercised unless the majority is compelled to make full disclosure regarding appraisals, earnings projections, and other information that sheds light on the value of the firm.

*Id.* at pp. 254–255.

■ We therefore will review the proxy material of Nationwide Corporation to see if it meets the standards of disclosure required by Rule 13e3. If in any instance there has been a failure to meet the standard, we will then examine whether such failure constitutes a material breach, and if we conclude that there is a jury question concerning the materiality of the breach, then, of course, there would be a genuine issue of fact to be determined. The test for materiality which we will utilize and which the parties agreed is appropriate in this situation is the test applied by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), whether there is a "substantial likelihood that, under all the circumstances the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholders." Thus, if we conclude that there is no substantial likelihood that the omission would have been significant in the deliberation of a reasonable shareholder, then there would be no question for a jury to decide. Otherwise, it will be left to the trier of fact to decide whether there has been a material misstatement or omission that falls below the standard mandated by Rule 13e3 and, if so, the jury must then determine the reasonable value of the stock which plaintiffs' class should have been paid at the time the merger was consummated.

At the oral argument and in the briefs, in a further attempt to focus on the issues of this case, the parties agree that the issue of liability was a matter of law for resolution by the Court since there exists no relevant or material conflicts in testimony or other issues appropriate for a jury, and plaintiffs' complaint can be boiled down to three general contentions. First, that the proxy statement did not sufficiently discuss the detriments and benefits resulting from the merger; second, that the proxy statement did not sufficiently discuss the timing of the merger proposal; and, third, that the proxy statement did not discuss the fairness of the merger in sufficient detail.

I Our examination begins with a review of the proxy statement and Item 7 of Schedule 13e–3, 17 C.F.R. § 240.13e–100, in order to determine whether the statement sufficiently discusses the detriments and resulting benefits from the merger.

■ Based upon our review of the proxy statement, we conclude that the requirement of a reasonably detailed discussion of the benefits and detriments was set forth prominently in the forepart of that document. The portion of the proxy statement entitled "Effect of the Transaction" disclosed that upon successful completion of

the merger, First Plaza would cease to exist and that Class A Common shareholders would receive $42.50 per share, which was substantially over market value and book value. The proxy statement proceeded to explain the possible tax consequences of the transaction and the fact that the public stockholders' interests would be extinguished.

The parties agree that the proxy statement contains a discussion of the intended benefits to Nationwide Mutual under the portion of the statement entitled "Purposes of the Transaction." However, plaintiffs contend that the information therein is not meaningful as the discussion is "boilerplate" and contains "patently contrived excuses for eliminating the minority interests." We disagree. The statement discloses four distinct purposes for the transaction. First, the elimination of public shareholder interests would alleviate potential conflict of interest problems presented by the presence of minority shareholder interests in respect to transactions involving the Corporation and its affiliates; second, the proposed merger would increase management flexibility; third, elimination of public shareholder interests would permit management to simplify management structure in order to avoid duplication of efforts; and fourth, the merger would result in the elimination of substantial costs in servicing the public shareholders. The proxy statement further notes that "Nationwide Corporation and Nationwide Mutual have not placed a monetary value on the benefits to be derived from the proposed transaction."

We recognize that the benefits to Nationwide Mutual may be difficult, if not impossible, to accurately quantify and conclude that the benefits to Nationwide Mutual resulting from the elimination of public shareholders were sufficiently set forth. Furthermore, there may be sound business reasons for not making such a quantification. We agree with Judge Rubin, who, after examining these identical four purposes, stated that "any attempt to quantify such expectations [anticipated advantages of the merger] might be met with legiti-mate charges of misrepresentation." *Efros v. Nationwide Corp.*, [1982–83] Fed.Sec.L. Rep. (CCH) ¶ 99,077 (S.D.Ohio 1983). We are reluctant to say that the purposes for the merger articulated in the proxy statement were contrived. "The business judgment rule recognizes that many important corporate decisions are made under conditions of uncertainty, and it prevents courts from imposing liability on the basis of judicial hindsight...." *Radol v. Thomas*, 772 F.2d at 257. We decline to second guess the directors of Nationwide as to the stated purpose for the merger and decline to quantify the benefits and detriments of the merger ourselves.

Plaintiffs further argue that the fact Mutual was financing the transaction from its own funds and that Mutual was sacrificing annual income of three million dollars to achieve the merger was a material fact which should have been disclosed. Plaintiffs' argument is not well-taken as the proxy statement clearly disclosed that Nationwide Mutual was providing the funds to finance the transaction, and we are not convinced that defendants were required to do more than that. Furthermore, a shareholder could surmise the approximate amount Nationwide Mutual was paying for the total number of Class A shares by reviewing the detailed financial information contained in the proxy statement.

Finally, plaintiffs contend that the proxy statement should have disclosed that as a result of the merger, Mutual would obtain a complete ownership interest in Nationwide and its assets at a proportionate value substantially in excess of the cash-out price. However, as we noted previously, many of the benefits of the transaction are unquantifiable, and it would be an imposition upon the business judgment of the drafters of the proxy statement to require them, in hindsight, to quantify these benefits. Moreover, we find that the financial picture was fully disclosed and therefore a reader of the proxy statement could easily determine that one of the advantages of the merger might be that Mutual would gain additional assets from the transaction.

We conclude that the detriments and benefits were adequately discussed in the proxy statement and that the gravamen of plaintiffs' argument on this issue is actually that the merger price itself was not fair to the public stockholders. However, our concern is not the specific terms of the transaction, but rather, whether there was full disclosure in the proxy statement, *Sante Fe Industries v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977) and we find that requirement was satisfied.

■■■ II The second part of our analysis concerns whether the proxy statement adequately disclosed the reasons for undertaking the transaction at the particular time in question, as required by Item 7 to Schedule 13E–3. The reason given in the proxy statement was that "the position of the Nationwide Companies in the insurance industries require them to increase flexibility and maximize cost savings to maintain their competitive position in the industry." The plaintiffs dismiss this statement as meaningless because that statement "would be true at any time." Furthermore, they assert that the earnings projections made by First Boston and Nationwide regarding future increases in earnings should have been disclosed in the proxy statement, as that was the true undisclosed purpose for undertaking the transaction at that particular time. Again, plaintiffs ask us to second guess the directorial actions and replace their judgment with our own judgment or opinion as to why the transaction was undertaken. We decline to do so. We conclude that defendants were not required to disclose earnings projections in the proxy statements. Judge Merritt noted in *Radol v. Thomas,* 772 F.2d 244:

> In *Starkman v. Marathon Oil Co.,* 722 F.2d 231 (6th Cir.1985), we have reaffirmed our adherence to the basic rule established by our prior decisions that tender offer materials must disclose soft

information, such as these asset appraisals based upon predictions regarding future economic and corporate events, *only if the predictions underlying the appraisal are substantially certain to hold.*

*Id.* at 252 (emphasis added).

In *Biechele v. Cedar Point, Inc.,* 747 F.2d 209 (6th Cir.1984), the Court held that a target's failure to disclose an appraisal based upon cash flow and earnings projections, intended to be used as a selling document in merger negotiations, did not violate Rule 10b–5, as the "selling document" and valuation based upon replacement cost of assets could be misleading to the shareholder. We conclude that the earnings projections made by First Boston and Nationwide was "soft" information, not substantially certain to hold, and therefore, it was not required to be disclosed under the proxy laws.[1]

III Finally, we must determine whether the proxy statement complied with the requirements of Item 8 of Schedule 13E–3 that the fairness of the merger be discussed in reasonable detail. Plaintiffs acknowledge that the proxy statement specifically states that the members of the Evaluation Committee believed the transaction was a fair one. However, plaintiffs assert that the belief must be expressed as a reasonable one, which was not the situation here because the "Evaluation Committee and Board of Directors could not possibly have a sufficient basis to form a reasonable opinion." Plaintiffs correctly point out that Schedule 13E–3 requires a discussion, in reasonable detail, of all material factors upon which the reasonable belief as to fairness is based and to the extent practicable, the weight to be assigned to each factor. The rule provides that:

> Such discussion should include an analysis of the extent, if any, to which such belief is based on the factors set forth [below] and Item 9.[2]

---

1. Additional discussions about the disclosure of earnings projections in proxy statements is contained in the portion of our Opinion addressing plaintiffs' contention that the proxy statement

did not discuss the First Boston opinions in sufficient detail.

2. The facts include current and historical market price of the stock, the book, liquidation and

17 C.F.R. § 240.13e–100.

The fairness opinion rendered by Nationwide in the proxy statement, in pertinent part, was as follows:

[T]he directors considered important, (i) the various business purposes addressed by management which the proposed merger will accomplish (see "SPECIAL FACTORS—Purposes of the Transaction"); (ii) the written opinion of First. Boston to the effect that the financial terms of the proposed merger were fair to the public shareholders of the Corporation (a copy of which is attached to this Proxy Statement as EXHIBIT II); and (iii) the report of the Evaluation Committee, that it believed the financial terms of the proposed merger to be fair to the public shareholder, based upon both First Boston's opinion and its review with representatives of First Boston of the terms and conditions of First Boston's engagement, and the scope of the investigation in giving the opinion.

The Evaluation Committee carefully reviewed with representatives of First Boston the terms of its engagement in this matter, particularly in respect of its relationship with Nationwide Mutual. The members of the Evaluation Committee concluded that, based upon its discussions with such representatives, it was appropriate in this case to rely upon First Boston's valuation and opinion in determining the fairness of the financial terms of the proposed merger to the public shareholders.

The members of the Evaluation Committee believe that, from a financial point of view, the terms of the proposed merger are fair to the public shareholders of the Corporation. The committee members considered important, as an indication of the fairness of the proposed merger, the receipt of the written opinion of First Boston. The committee members also considered important a number of other factors discussed with the representa-

tives of First Boston. These factors are the current market price of the Class A Common shares as compared with stock prices of other comparable entities; past and current earnings of the Corporation; past and current price/earnings ratios of the Corporation and other companies having similar operations; past and current price/equity ratios of the Corporation (as computed in accordance with generally accepted accounting principles); and the premium over market price offered to the public shareholders in this transaction as compared to recent premiums paid to minority shareholders in other similar transactions as well as in other recent acquisitions in the life insurance industry generally. In its discussions with the representatives of First Boston, upon whose opinion the Evaluation Committee has concluded that it is appropriate to rely, these representatives stated that in addition to the above noted factors they had also considered the current overall level of the stock market; historical market prices of the Class A Common shares as compared with market prices for the stock of other comparable entities; going concern value of the Corporation; net book value of the Corporation; liquidation value of the Corporation; various financial ratios; present revenues, expenses, earnings and dividends of the Corporation and trends with respect thereto; the purchase price paid to holders of Class A Common shares by Nationwide Mutual in connection with the December 1978 tender offer for the Class A Common shares; present value of projected future cash flows of the Corporation; replacement value of the Corporation; off balance sheet items of the Corporation; significant trends in the insurance business; competitive environment of the insurance industry; regulatory environment of the insurance industry; and the impact of inflation on the Corporation.

going concern values of the corporation; and the price paid in previous purchases. Item 9 requires the issuer or affiliate to state whether it

has received any report, opinion or appraisal from an outside party which is materially related to the Rule 13e–3 transaction.

Although the Evaluation Committee did not give specific weight to each of the various factors considered in evaluating the fairness of the proposed merger, particular emphasis was placed upon the receipt of the opinion of First Boston. The members of the Evaluation Committee believed it to be particularly important that the prices to be paid to the public shareholders for their Class A Common shares ($42.50 per share) represented a premium over the quoted bid price of the Class A Common shares on the next to last trading day prior to the public announcement of the proposed merger on November 3, 1982, as reported by the National Quotation Bureau Inc.

The plaintiffs advance three arguments in regard to the fairness opinion. First, that the proxy statement did not sufficiently discuss the net book value, liquidation value, and going concern value of Nationwide; second, that the proxy statement did not explicitly state that the Nationwide stock was "thinly traded"; and third, that the proxy statement did not sufficiently discuss the basis for the First Boston fairness opinion.

■ As to plaintiffs' first contention, we note that the proxy statement contained extensive financial information necessary to compute the net book, liquidation, and going concern values of Nationwide shares. Plaintiffs have offered no case which has held that more is required. On the other hand, defendants point out numerous cases, decided subsequent to the promulgation of Rule 13e–3, where proxy statements were upheld, containing no more detailed discussions of net book value, liquidation value, and going concern values than the discussion contained in the proxy statement in question. *Radol v. Thomas*, 534 F.Supp. 1302, 1315–17 (S.D.Ohio 1982); *Berg v. First American Bankshares, Inc.*, [1984–85] Fed.Sec.L.Rep. (CCH) ¶ 92,011 (D.D.C.1985); *Nutis v. Penn Merchandising Corp.*, 610 F.Supp. 1573 (E.D.Pa.1985). Rule 13e–3 "merely requires that an opinion be given and the material factors on which it is based be disclosed." *Radol*, 534

F.Supp. at 1316. We conclude that defendants satisfied this requirement of Rule 13e–3 by listing the factors considered by the Evaluation Committee and by candidly stating that no specific weight was given to any one factor, but of particular importance in the consideration was First Boston's opinion and the fact that the merger price represented a premium over the market price of the stock.

■ Plaintiffs strongly urge that Nationwide was required to discuss the fact that "significant balance sheet items, even though reported in accordance with GAAP, actually understate the assets, understate the liquidity of the company, and overstate liabilities by significant amounts." Plaintiffs contend that Nationwide was required to disclose that most life insurance companies are valued substantially in excess of book value or net asset value because GAAP reporting tends to understate net asset and liquidity values. Plaintiffs have not offered any authority which would require defendants to make such a disclosure. Moreover, we are persuaded by the fact that Peat, Marwick, Mitchell & Co., independent outside auditors, reviewed the financial information contained in the proxy statement and opined that "such financial statements present fairly the financial position of Nationwide Corporation and its subsidiaries, ... in conformity with generally accepted accounting principles applied on a consistent basis." We are further persuaded by the testimony of plaintiffs' own expert who stated that he was unable to single out anything about the financial information which was inaccurate or misleading (Clark deposition, p. 153). From the foregoing, we conclude that the proxy statement adequately set forth the net book, liquidation, and going concern value of Nationwide shares.

■ Plaintiffs' second contention relating to the "fairness" requirement of Rule 13e–3 is that Nationwide should have disclosed that the stock was "thinly traded." We disagree. The proxy statement disclosed that Nationwide Mutual owned 85.6% of the outstanding Class A shares,

the number of publicly held shares, the number of public stockholders, and that the stock was traded only in the "over-the-counter market." We are mindful of the universal rule that a proxy statement need only set forth the full and fair picture, without interpretation or characterization, so that a reasonably prudent stockholder can make an intelligent decision, whether the question arises in a suit brought under §§ 14(a) or (e) or 10(b) and Rule 10b–5. *Sante Fe Industries, Inc. v. Green*, 430 U.S. at 474–77, 97 S.Ct. at 1301–03; *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757; *Golub v. PPD Corp.*, 576 F.2d 759 (8th Cir.1978). We conclude that this statement of the law is also applicable to a claim under Rule 13e–3. While recognizing that the freeze-out merger situation requires more stringent legal disclosure requirements, *Radol v. Thomas*, 772 F.2d 244, we do not believe that the more extensive disclosure requirements should cause us to lose sight of the purpose of the proxy statement, which is to provide enough information so that the shareholder can draw his own conclusions and make his own decisions. After reviewing the proxy statement, we conclude that enough information was provided therein to allow a reasonably prudent shareholder to make his own characterization of the market for Nationwide stock.

Finally, plaintiffs argue that the proxy statement contained an inadequate discussion of the First Boston opinions, that the proxy statement should have disclosed the method utilized in determining the $42.50 price, and that First Boston never determined the intrinsic value of Nationwide or its stock. More specifically, plaintiffs contend that the proxy statement fails to set forth projected growth rates and increase of earnings. We conclude that such projections were not required to be disclosed. "[T]he law mandates disclosure only of existing material facts. It does not require ... any economic forecasts." *Arber v. Essex Wire Corporation*, 490 F.2d 414 (6th Cir.1974).

The most recent pronouncements by the Sixth Circuit reaffirm this basic rule in the context of Rule 13e–3. In *Starkman v. Marathon*, 772 F.2d 231, the Court stated:

> With respect to asset appraisals, Rule 13e–3, 17 C.F.R. § 240.13e–3 requires disclosure of the information called for by Items 7, 8, and 9 of Schedule 13E–3, 17 C.F.R. § 240.13e–100, in the context of freezeout mergers. Item 8 of Schedule 13E–3 requires disclosure of factors important in determining the fairness of such a transaction to unaffiliated shareholders, and these factors include liquidation value; Item 9 of that same schedule says that a summary of any outside appraisal must be furnished, with the summary including a discussion of the procedures and methods of arriving at the findings and recommendations of the appraisal. However, a 1979 SEC-proposed amendment under which an issuer would have to disclose any projection given to an appraisal furnisher was never adopted, *see* 2 Fed.Sec.L.Rep. (CCH) ¶ 23–706, at 17,245–21 through ?1A, and, even more importantly, in *Radol v. Thomas*, 772 F.2d 244 (6th Cir.1985), we have rejected the position that SEC rules regarding freezeout mergers and proxies should determine the disclosure obligations of target management in the first stage of a two-tier tender offer.

*Id.* at 240.

The Court, in *Starkman*, further noted that the disclosure of "soft" information such as appraisals and earnings projections is required only when "the reported values are virtually as certain as hard facts," *Id.* at 241, and that earnings and cash flow projections do not rise to the level of substantial certainty triggering a duty to disclose. *Id.* at 242 (citing *Biechele v. Cedar Point*, 747 F.2d 209 (6th Cir.1984) and *James v. Gerber Products Co.*, 587 F.2d 324, 327 (6th Cir.1978)). In the companion case of *Radol v. Thomas*, 772 F.2d 244, the Court specifically approved the instruction that a "failure to make known a projection of future earnings is not a violation of the Federal Securities Law." *Id.* at 252.

Therefore, we conclude that defendants were not required to disclose projected growth rates and future increase of earnings.

Additionally, plaintiffs argue that the discussion of the First Boston Opinion should have disclosed information regarding comparable life insurance companies as such information would reveal the unfairness of the cash out price. Specifically, plaintiffs contend that the shareholders should have been told that First Boston stated that acquisition of life insurance companies generally range from one to four times book value. On this point, we find the reasoning of the Court in *Gans v. Filmways, Inc.*, 453 F.Supp. 1116 (E.D.Pa. 1978) to be persuasive:

> [I]nsurance companies are not fungible entities and the value of one company is not a reliable indication of the value of another. Secondly, and perhaps more importantly, the notion of book value is of little if any help in determining the actual value of a share of stock. As Chief Judge Lord of this district has noted, the 'suggestion that book value is any indication of the real value of shares of stock has long been discredited, and should not have been resurrected for the purposes of this proxy solicitation.' Because book value has no relation to real value, it is indisputable that a reasonable investor would not consider the ratio of book value to exchange rate in other sales of insurance companies of any importance in deciding how to vote on this particular merger.

*Id.* at 1120 (citations and footnotes omitted).

■ There is no indication that there was anyone or any other entity, besides Mutual, interested in purchasing Nationwide. Therefore, the alleged omission of "comparable values" was immaterial and indeed such information may have been misleading if discussed.

## CONCLUSION

■ From the foregoing, we conclude that defendants' proxy statement satisfied the requirements of Rule 13e–3 and explanatory schedules relating thereto. Most important, there was sufficient information disclosed in the proxy statement to enable the stockholders to make an informed decision on what to do. It is the conclusion of the Court, therefore, that there is no genuine issue of material fact concerning the adequacy of the proxy statement when measured against the standards set forth in Rule 13e–3, and that any omissions pointed out by plaintiffs were not material as defined by the Court in *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132.

■ Having concluded that the disclosure requirements of Rule 13e–3 were satisfied, all that remains of plaintiffs' claim is actually a controversy over the adequacy of the price paid per share, which is not a cognizable claim under the Federal Securities Law. *Marsh v. Armada Corp.*, 533 F.2d 978, 979 (6th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). Moreover, since there is no evidence of any breach of fiduciary duty owed plaintiffs by defendants, and the merger was neither unauthorized by statute, illegal nor ultra vires under Ohio corporation law, the Ohio statutory appraisal right constituted plaintiffs' exclusive state law remedy. Plaintiffs have failed to avail themselves of that remedy. We note that the merger was approved by an overwhelming 94.7% of the voted public shares and no shareholder elected to proceed in the Ohio courts to determine the fair cash value of the stock pursuant to § 1701.85 of the Ohio Revised Code. We will not permit them now to pursue their state claim, disguised as a violation of federal securities law, in Federal Court. Consequently, judgment shall be entered for defendants dismissing the amended complaint.

SO ORDERED.