790 F.2d 453
 122 L.R.R.M. (BNA) 2153, 54 USLW 2611,
104 Lab.Cas. P 55,592,
1 Indiv.Empl.Rts.Cas. 451
 Mary Ann REID (No. 84-1189), John Serra (No. 84-1199), Mary
Batchelor (Nos. 83- 1842, 84-1511), Plaintiffs-Appellants,
v.
SEARS, ROEBUCK AND COMPANY, a New York Corporation,
Defendant-Appellee.
 Nos. 84-1189, 84-1199, 83-1842 and 84-1511.
 United States Court of Appeals, Sixth Circuit.
 Argued Nov. 13, 1985.
Decided April 28, 1986.
 
 L. Rodger Webb (argued), Detroit, Mich., for plaintiffs-appellants in Nos. 84-1511, 83-1842.
 Dennis P. Brescoll (argued), Brescoll and Associates, Mount Clemens, Mich., for plaintiffs-appellants in Nos. 84-1189, 84-1199.
 Charles C. DeWitt, Jr. and Robert L. Duty, Detroit, Mich., counsel for defendant-appellee.
 Before LIVELY, Chief Judge, and MERRITT and JONES, Circuit Judges.*
 LIVELY, Chief Judge.
 
 
 1
 These three appeals were argued separately, but have been consolidated for opinion since all require application of the same body of Michigan law. The three plaintiffs are former employees of Sears who were discharged without a showing of good cause. The plaintiffs brought separate suits in Michigan courts, claiming that their employment contracts with Sears, though for indefinite terms, required Sears to show good cause before they could be discharged. All relied on the seminal decision of the Supreme Court of Michigan in Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880 (1980). The cases were removed to the United States District Court for the Eastern District of Michigan on the basis of diversity of citizenship. Three judges of the District heard the cases, 588 F.Supp. 558, and each granted summary judgment in favor of Sears.
 
 I.
 
 2
 In Toussaint the Supreme Court of Michigan recognized the general rule that "in the absence of distinguishing features or provisions or a consideration in addition to the services to be rendered, ... contracts [for permanent employment] are indefinite hirings, terminable at the will of either party." 408 Mich. at 596, 292 N.W.2d 880, quoting Lynas v. Maxwell Farms, 279 Mich. 684, 687, 273 N.W. 315 (1937). The court held, however, that the general rule does not apply when the contract of employment provides that the employee may not be discharged except for cause. Though such a contract is indefinite, the requirement of cause is enforceable. A provision requiring cause for the discharge of an indefinite term employee "may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." Id. 408 Mich. at 598, 292 N.W.2d 880. The court further held that the jury properly could have found that Toussaint had a legitimate expectation of continued employment on the basis of his employer's written policy statement set forth in a manual of personnel policies.
 
 
 3
 Toussaint's employer, Blue Cross, and Masco Corporation, the employer of the plaintiff Ebling in a companion case, argued that the rule announced by the Michigan Supreme Court would make it impossible to have a contract of employment that was terminable at the will of either party. The court responded to this argument:
 
 
 4
 Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract.
 
 
 5
 Id. at 610, 292 N.W.2d 880. The court further amplified this condition as follows:
 
 
 6
 If Blue Cross or Masco had desired, they could have established a company policy of requiring prospective employees to acknowledge that they served at the will or the pleasure of the company and, thus, have avoided the misunderstandings that generated this litigation.[24]
 
 
 7
 Id. at 612, 292 N.W.2d 880. Footnote 24 states in part:
 
 
 8
 Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer.
 
 
 9
 Id. The Supreme Court of Michigan found that neither employer in Toussaint had so protected itself and that both had created situations in which the employees had legitimate expectations of continued employment in the absence of a showing of good cause for discharge.
 
 
 10
 The Supreme Court of Michigan recently described its holding in Toussaint as follows:
 
 
 11
 In Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 NW2d 880 (1980), this Court held that an employment contract providing that an employee would not be terminated except for cause was enforceable although no definite term of employment was stated.
 
 
 12
 Toussaint makes employment contracts which provide that an employee will not be dismissed except for cause enforceable in the same manner as other contracts. It did not recognize employment as a fundamental right or create a new "special" right. The only right held in Toussaint to be enforceable was the right that arose out of the promise not to terminate except for cause.
 
 
 13
 Employers and employees remain free to provide, or not to provide, for job security. Absent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason.
 
 
 14
 Valentine v. General American Credit, Inc., 420 Mich. 256, 258-59, 362 N.W.2d 628 (1984) (footnote omitted). Justice Charles L. Levin was the author of both the Toussaint and the Valentine opinions.
 
 II.
 A.
 
 15
 Each of the plaintiffs in the three cases before us had been employed by Sears for more than ten years. Before being hired each had signed an application for employment that provided:
 
 
 16
 In consideration of my employment, I agree to conform to the rules and regulations of Sears, Roebuck and Co., and my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself. I understand that no store manager or representative of Sears, Roebuck and Co., other than the president or vice president of the Company, has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.
 
 
 17
 It is clear that, though this acknowledgement was obtained long before the ruling in Toussaint, Sears attempted to protect itself from claims such as those of these plaintiffs in precisely the manner described by the court in Toussaint. However, Reid, Serra and Batchelor all contend that they produced evidence from which a jury could have found that Sears created a legitimate expectation of continued employment, and that the district court committed reversible error in granting summary judgment.
 
 B.
 
 18
 The plaintiffs rely on certain promises allegedly made to them. Mrs. Reid states that when she first began working full time at Sears her store manager told her, "The job is yours as long as you want it." Ms. Batchelor claims not only that she was told in her job interview that there were "three main reasons" why Sears employees are fired but also that she was told by a former supervisor that he would intervene on her behalf to make sure she was not laid off. Mr. Serra relies on promises of job security from his supervisors. Sears replies that since none of these alleged oral promises came from a president or vice president, they cannot possibly have created a legitimate expectancy in the face of the language contained in the application for employment.
 
 
 19
 All of the plaintiffs also assert that the Sears employee handbook, "Getting Acquainted with Sears," created an implied contract to discharge only for cause. The handbook provided, at page 23: EMPLOYE RULES
 
 
 20
 Since you are new to Sears, it is important for you to know what personal conduct is expected of you while on the job. In most instances your own good judgment will tell you what is the right thing to do. However, you should know what specific rules must be followed since violation of these rules may result in termination of your employment.
 
 
 21
 . Unsatisfactory performance of your job.
 
 
 22
 . Theft.
 
 
 23
 . Refusal to follow instructions directly related to the performance of your job (example: insubordination).
 
 
 24
 . Disorderly conduct; reporting for work under the influence of liquor, drugs or other stimulants, or consumption of such substances while on Company premises.
 
 
 25
 . Obtaining employment on the basis of false or misleading information.
 
 
 26
 . Falsifying a timecard by intentionally punching another employe's timecard or intentionally permitting anyone else to punch your timecard.
 
 
 27
 . Excessive absences or tardiness including absence from your job for two consecutive days without notifying your unit.
 
 
 28
 . Soliciting or accepting gifts (money or merchandise) in connection with a Company transaction of any kind. Also conducting other than Company business on Company premises without authority.
 
 
 29
 . Committing, or attempting to commit, deliberate damage to Company property, advocating or taking part in unlawful seizure of, or trespassing on, Company property.
 
 
 30
 The plaintiffs argue that the effect of this language was to create an implied contract to discharge only for one of the listed causes or for some other good reason.
 
 C.
 
 31
 We state briefly the circumstances surrounding the three discharges:
 
 
 32
 Mary Ann Reid had been employed by Sears for 17 years. In January 1981, the battery was stolen from a car which her son had borrowed from his grandmother, plaintiff's mother. When the son called his father for advice, Mr. Reid agreed to buy a new battery to replace the stolen one, and he did so using his wife's 10% employee discount at Sears. When Mrs. Reid's mother consulted her insurance company, she was told that she could not recover without receipts for the purchase both of the stolen battery and of the replacement. She no longer had the first receipt, and the insurance company would not accept the second because it was in Mr. Reid's name, not hers. To substantiate her mother's insurance claim, Mrs. Reid asked Tom Dunaj, a non-supervisory employee in the automotive department, to make out two new invoices. He did so, although the new invoice for the replacement battery failed to take the employee discount into account. Mr. Everest, the manager of the Grosse Pointe store where Mrs. Reid worked, was contacted by the insurance company when they noticed that the two invoices, though dated two months apart, were numbered consecutively. Upon being questioned, Dunaj and Reid admitted their actions, and both were fired for willful misconduct.
 
 
 33
 John Serra asserts that, during the year before he was fired, he was under pressure to give older salespeople working under him lower performance evaluations than they deserved. Because of this, he had arranged to transfer to sales. Before the transfer, however, a "bookcheck audit" was performed on the two divisions he was responsible for. A number of items were questioned, and Mr. Serra submitted explanations. One of the questionable bookchecks was for the sale of a lawnmower to Gary Redfern, one of Serra's salesmen. The lawnmower was sold at a sale price after the sale had ended. Mr. Serra's version of the story is that while the lawnmower was on sale, Redfern's father-in-law had received a "raincheck" on the lawnmower, which he intended to buy for Gary. Mr. Serra says that Gary, on questioning, told him that when the lawnmower came in, his father-in-law suggested that he instead give Gary the money so that he could use his 10% discount. Mr. Redfern, however, told company officials investigating the matter that this story was a complete fabrication and that Mr. Serra had simply given him a sale price on the mower. The sale came into question initially because a raincheck sale is supposed to be rung up on the original bookcheck with the sale date on it; this one was recorded on a new bookcheck. Mr. Serra notes that this deviation from policy required his authorization, and that the bookcheck does not bear his signature; the clerk who made the sale said he had Serra's oral authorization. Redfern also told the investigators that Serra had repeatedly authorized the sale of regular merchandise at sale prices. Mr. Serra was fired, and told that he was being discharged for a violation of company policy on "category 57 miscellaneous markdown," i.e., for allowing the sale of merchandise at a promotional price when it was not on sale.
 
 
 34
 On March 20, 1982, while on break, Mary Batchelor went to the cosmetics department of Sears and made some purchases. While she was there, she dropped a bottle of nail polish into her purse. Sears asserts that she intended to steal it; she maintains that the polish must have fallen into her purse inadvertently after she checked its color against her own make-up. She says that when she discovered that she still had the polish she intended to pay for it, but decided to wait until later because her co-worker was so rushed. She went into the locker room, placed her purse in her locker, and put the polish in a separate locker, intending to pay for it later. She contends that employees customarily used the locker for that purpose, though she knew she wasn't supposed to. (A written directive forbidding this practice was sent around to some employees after Ms. Batchelor was fired.) Shortly after leaving the polish in the locker room, Ms. Batchelor was approached and questioned by two security guards. When she returned to work the following Monday morning, she was questioned. Ms. Batchelor maintains that she was badly intimidated by the interrogation. That morning, she wrote out a signed statement which reads:
 
 
 35
 I went and paid for three items [D]rop[ed] nail polish in pocket book [G]ot [b]ack to my dept. and I took it out put it in locker. I had star[te]d not to pay for it. But could not do so. I was going to get Ann to [ri]ng it up [b]ut there was a lot of customers at the time.
 
 Mary Batchelor
 
 36
 At her deposition, Ms. Batchelor stated that she never meant to steal anything. Shortly after the statement was signed, Ms. Batchelor was fired. She alleges that she suffered severe depression.
 
 
 37
 Each of the three contends he or she was actually fired for reasons other than those which Sears gave. Mrs. Reid asserts that the cash office, where she worked, was soon to need fewer employees, and that her firing fits in with a general pattern at Sears of replacing higher paid full-time employees with lower paid part-timers. Mr. Serra claims he was fired in retaliation for his unwillingness to adjust his employee evaluations to further this policy. Ms. Batchelor maintains that the store was in the midst of a record-setting shoplifting campaign and that catching her redounded to the credit of the store manager.
 
 III.
 
 38
 The parties have raised several preliminary questions about the proceedings in the district court.
 
 
 39
 Mrs. Reid asserts that the district judge improperly placed on her the burden of defeating Sears's motion for summary judgment. She relies on the statement in Smith v. Hudson, 600 F.2d 60, 64 (6th Cir.), cert. dismissed, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), that the non-moving party is never required to respond in order to prevail on a motion for summary judgment since the movant bears the burden of establishing the nonexistence of a disputed issue of material fact. She overlooks the equally applicable rule that once the movant has met its initial burden, the non-moving party may not rest on the allegations of her complaint, but must produce some evidence of factual issues: "Plaintiffs are not entitled 'to get to the jury on the basis of the allegations of their complaints, coupled with the hope that something can be developed at trial....' " Id. at 65, quoting First National Bank v. Cities Service, 391 U.S. 253, 289-90, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968).
 
 
 40
 Mr. Serra argues that the district court committed error by applying the standards of Rule 56, Fed.R.Civ.P., to his case. He contends that Sears would not have qualified for summary judgment under Michigan law and that the outcome of a diversity case should not be different in a federal court than it would have been in the state whose substantive law controls. Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945). This argument fails to recognize the difference between procedural rules and substantive law. The Federal Rules of Civil Procedure are the rules of practice which apply to civil actions in the federal courts, regardless of whether jurisdiction is based on federal question or diversity of citizenship. Summary judgment is a procedural device for deciding a case without the necessity of a full-blown trial. When there is a motion for summary judgment in a diversity case, the provisions of Rule 56 control its determination. Cf. Bichler v. Union Bank & Trust Co., 745 F.2d 1006, 1014 (6th Cir.1984) (applying Rule 56 in a diversity case where the law of Michigan required issue of actor's mental state to be submitted to a jury). The fact that the Michigan procedure for summary judgment has different requirements from Rule 56 is immaterial. The requirements of Rule 56 control, and they were met by Sears.
 
 
 41
 Mr. Serra also maintains that the district court committed reversible error in denying his motion to amend his complaint to assert a claim of violation of Michigan's Elliott-Larson Act. We note that this Michigan civil rights statute was not mentioned in the original complaint, even though that pleading was filed in a state court. We find no abuse of discretion in the district court's denial of the motion to amend. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).
 
 
 42
 Ms. Batchelor contends that her affidavit established the existence of a genuine issue of material fact. In this affidavit Ms. Batchelor adopted a statement of facts contained in the brief filed by her counsel in opposition to Sears's motion for summary judgment. In the brief her counsel stated that Ms. Batchelor had difficulty reading the application for employment and did not understand that the "application purported to be a 'contract of employment' that could only be altered by the President of the company, or that the fine print purported to suggest or establish that she could be fired for no reason without notice." The brief also stated that after she had signed the application for employment Ms. Batchelor was interviewed by a Sears personnel representative. Upon inquiring about grounds for discharge, according to the brief, Ms. Batchelor was told that the "main reasons" Sears employees were discharged were for falsification of time cards, excessive tardiness or absences, and theft. During the course of this interview Ms. Batchelor was given the handbook that stated several "Employe Rules," violation of which "may result in termination of your employment."
 
 
 43
 Sears contends that the district court properly refused to find an issue of fact on the basis of the statement adopted in the affidavit. Ms. Batchelor gave her deposition prior to making the affidavit. When first asked in her deposition what transpired at the employment interview Ms. Batchelor replied that she could remember nothing other than that the Sears representative told her she could be fired for punching someone else's time card. Her counsel attempted to reopen this matter with a leading question, "Was there anything to the effect of you didn't have to worry about being laid off?" Ms. Batchelor answered, "Yes." Counsel for Sears objected on the ground that the witness had previously answered a properly phrased question that she could not remember anything else that had been said. When the question was repeated Ms. Batchelor answered, "No."
 
 
 44
 The district court properly refused to deny summary judgment on the basis of the affidavit. A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984). Even in response to a leading question in her deposition Ms. Batchelor replied that no promise was made at the interview to the effect that she didn't have to worry about being laid off. If such a statement had been made she was required to bring it out at the deposition and could not contradict her deposition testimony in a subsequent affidavit. In Biechele v. Cedar Point, Inc., 747 F.2d at 215, we quoted from Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir.1969):
 
 
 45
 If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.
 
 
 46
 The issue concerning the Sears handbook raised by the affidavit will be treated in connection with similar claims by the other two plaintiffs.
 
 IV.
 A.
 
 47
 We conclude that summary judgment was proper in all three cases. A contract to discharge only for cause may not be based on "a mere subjective expectancy." Schwartz v. Michigan Sugar Co., 106 Mich.App. 471, 478, 308 N.W.2d 459 (1981), appeal denied, 414 Mich. 870 (1982). The plaintiffs maintain that they had more than a subjective expectancy of continued employment; that the "Employe Rules" created an implied contract to discharge only for cause. The plaintiffs argue that by listing conduct that "may result in the termination of your employment" in the handbook Sears limited its right to discharge employees and that a discharge for any other reason would not be for good cause. They rely principally on Schipani v. Ford Motor Co., 102 Mich.App. 606, 302 N.W.2d 307 (1981), in support of this argument. In Schipani the employee had signed a written agreement providing:
 
 
 48
 I understand that my employment is not for any definite term, and may be terminated at any time, without advance notice by either myself or Ford Motor Company.
 
 
 49
 The plaintiff in Schipani argued that he was entitled to continued employment because Ford's literature, policy and practices led him to believe he would be employed to normal retirement age. The Michigan Court of Appeals held that Schipani had demonstrated the existence of a genuine issue of material fact as to whether he reasonably relied on policy statements. Schipani is readily distinguishable. The Ford disclaimer did not provide that no employee of Ford other than the president or a vice president of the company could make a contrary agreement.
 
 
 50
 We do not believe the listing of causes that "may result in the termination of your employment" in the Sears handbook detracted in any way from the language in the application or provided a reasonable basis for the conclusion that the plaintiffs were employed under a "for cause" contract. The fact that certain acts were identified as conduct that might lead to discharge did not indicate that these acts were the exclusive permissible grounds for discharge. Moreover, the Sears handbook had no language similar to that relied upon in Toussaint: "to treat employees leaving Blue Cross in a fair and consistent manner and to release employees for just cause only." 408 Mich. at 617, 292 N.W.2d 880 (emphasis added). Finally, there was no showing that the handbook had been written or approved by the president or a vice president of Sears.
 
 
 51
 The feature that distinguishes the present cases from Toussaint and all other Michigan decisions relied upon by the plaintiffs is the unequivocal language contained in the application for employment that each of the plaintiffs signed. Toussaint makes it clear that an employer can defeat claims that an employee could be discharged only for good cause by "requiring prospective employees to acknowledge that they serve[ ] at the will or pleasure of the company...." 408 Mich. at 612, 292 N.W.2d 880 (emphasis added). Since the acknowledgement should be obtained from prospective employees, Sears properly included this provision of employment in the application form rather than in some documents to be signed by the employee after he or she was hired.
 
 
 52
 Every reported district court case involving a claim of unlawful discharge in the face of the language contained in the Sears application has resulted in summary judgment for Sears. Novosel v. Sears, Roebuck & Co., 495 F.Supp. 344 (E.D.Mich.1980); Summers v. Sears, Roebuck & Co., 549 F.Supp. 1157 (E.D.Mich.1982); Ringwelski v. Sears, Roebuck & Co., --- F.Supp. ---- (E.D.Mich. Sept. 6, 1985). Further, the Michigan Court of Appeals affirmed summary judgment for Sears in Eliel v. Sears, Roebuck & Co., 387 N.W.2d 842 (Mich.App. 1985). The court found that Eliel's employment was governed by the terms of the application and that none of the subsequent statements by Sears representatives relied on by the plaintiff was made by the president or a vice president of the company. The Michigan Court of Appeals reached the same conclusion in a case against another employer whose agreement with its employees required an acknowledgement that "my employment and compensation can be terminated, with or without cause, and with or without notice at any time at the option of either the Company or myself...." Ledl v. Quik Pik Stores, 133 Mich.App. 583, 349 N.W.2d 529 (1984).
 
 B.
 
 53
 Mrs. Reid and Ms. Batchelor contend that the "with or without cause" provision of the application never became part of their employment contracts. Ms. Batchelor states that she signed the application one day, was interviewed another day and hired a third day. The district court agreed with her that the application was not a job offer, but found that it was part of the negotiations and became part of the employment contract when Sears did make an offer which Ms. Batchelor accepted. Ms. Batchelor stated in her affidavit that she read poorly and signed the application without understanding that it purported to make her employment at will. Her affidavit did not state that she informed any Sears representative of her difficulty or sought assistance from a company source. We have ruled that the affidavit statements concerning alleged assurances made by unidentified representatives of Sears did not create an issue of fact. Nevertheless, since the application was not mentioned at the subsequent interview or on the day of hiring, Ms. Batchelor argues that its provisions were never incorporated into the contract. Mrs. Reid joins in this argument.
 
 
 54
 The district court correctly held that Ms. Batchelor was bound by the terms of the application. She had an obligation to seek assistance before she signed if she felt she did not understand the application. The Supreme Court of Michigan so held in Sponseller v. Kimball, 246 Mich. 255, 260, 224 N.W. 359 (1929):
 
 
 55
 The stability of written instruments demands that a person who executes one shall know of its contents or be chargeable with such knowledge. If he cannot read, he should have a reliable person read it to him. His failure to do so is negligence which estops him from voiding the instrument on the ground that he was ignorant of its contents, in the absence of circumstances fairly excusing his failure to inform himself.
 
 
 56
 The employment contract with the three plaintiffs clearly included the terms of the application. Toussaint held that employers can avoid misunderstanding over the term of employment by "requiring prospective employees to acknowledge that they serve[ ] at the will or pleasure of the company...." 408 Mich. at 612, 292 N.W.2d 880. Having obtained such an acknowledgement from each of the plaintiffs when they were prospective employees, Sears had done all that was required to create contracts for employment at will. Though Toussaint holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will. It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one. Steele v. Cold Heading Co., 125 Mich.App. 199, 203, 336 N.W.2d 1 (1983); In re DeHaan's Estate, 169 Mich. 146, 149, 134 N.W. 983 (1912).
 
 V.
 
 57
 All three plaintiffs made additional claims on the basis of alleged tortious actions by Sears. Mrs. Reid and Mr. Serra assert that Sears failed to carefully evaluate their performance and the charges against them. These claims for "negligent evaluation" are premised on the existence of a good cause contract. Since we have held that the contracts with Mrs. Reid and Mr. Serra were terminable at will either with or without cause, there could be no duty to evaluate before discharging. Sears was entitled to judgment as a matter of law on these claims.
 
 
 58
 Ms. Batchelor charged Sears with intentional infliction of emotional distress. This claim, too, rests on the assumption that the plaintiff had a good cause contract. Since Ms. Batchelor did not have such a contract, Sears was within its rights when it terminated her employment, regardless of the reasons for the discharge. Michigan follows Restatement (Second) of Torts Sec. 46 in defining the elements of a claim for intentional infliction of emotional distress. The Restatement requires "extreme and outrageous conduct." As the court stated in Ledl v. Quik Pik Stores, 133 Mich.App. at 591, 349 N.W.2d 529: "Where the actor does no more than insist upon his own legal rights, no liability will be imposed." See also Novosel v. Sears, Roebuck & Co., 495 F.Supp. at 347 ("Since ... the defendant exercised its legal rights in a permissible fashion when it terminated the plaintiff, the plaintiff's cause of action for intentional infliction of emotional distress must fail.") Neither plaintiff has identified conduct that can properly be found "extreme and outrageous."
 
 VI.
 
 59
 Ms. Batchelor has filed a separate appeal (No. 84-1511) from the district court's denial of her motion to supplement the record on appeal. The district court concluded that Ms. Batchelor had, "at most," a satisfaction contract. Referring to the first listed reason for discharge in the handbook, "Unsatisfactory performance of your job," the district court found this to be a classic example of a satisfaction contract. After summary judgment was granted, Ms. Batchelor sought to introduce a page of the personnel manual that she had not offered during the trial in order to show that the quoted language did not make her employment agreement a satisfaction contract.
 
 
 60
 This issue is rendered moot by our determination that Ms. Batchelor was employed by Sears under an at will contract. Nothing in the proffered material would affect our determination that Ms. Batchelor was employed at will. This being so, there is no need to resolve the issue raised in No. 84-1511.
 
 
 61
 The judgments in Nos. 84-1189, 84-1199 and 83-1842 are affirmed. Appeal No. 84-1511 is dismissed. No costs are allowed; the parties will bear their own costs.
 
 
 62
 NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.
 
 
 63
 I concur in the court's interpretation and application of the Toussaint rule. I am troubled, however, by the short shrift given to Ms. Batchelor's claim that, due to her poor reading ability, she could not comprehend the disclaimer and merely signed the job application form in a routine manner without realizing its contractual nature. Batchelor presented evidence of her limited education and reading level, and also presented an expert's analysis of the level of reading difficulty of the Sears "contract." The district court rejected her argument summarily, relying on a passage from a 1929 decision that states the general rule of "signer beware." Sponseller v. Kimball, 246 Mich. 255, 260, 224 N.W. 359 (1929); see ante at pp. 461-462.
 
 
 64
 The general rule is not always applicable, however. See generally 1 S. Williston, A Treatise on the Law of Contracts, Sec. 95A, at pp. 350-53 (Jaeger ed. 1957 & 1985 Supp.); J. Murray, Murray on Contracts, Secs. 351-54, at pp. 739, 752, 756 (1974). When a person signs a document unaware of its contractual nature, courts do not always require or presume the caution and scrutiny ordinarily associated with signing a contract. See S. Williston, supra, at pp. 351-52 & n. 13. Although it is established under Michigan law that these employment contracts are not adhesion contracts in which parties are compelled by unequal bargaining power to accept unreasonable terms, it is a different question, I believe, as to whether a valid contract exists when the signer does not comprehend that placing his signature on a form constitutes assent to specific contractual terms. See, e.g., S. Williston, supra, at 351-52; J. Murray, supra, at p. 756.
 
 
 65
 Moreover, the Sponseller decision was founded on facts materially different from those before us. Sponseller involved a sale of real estate. A man and his wife executed four instruments--a mortgage, a deed, a contract and a settlement--which included conveyances of property belonging to the wife. When she later asserted that she signed these instruments without realizing her property was included, the court rejected her claim. She had participated in deeds and mortgages before, and all the documents were read to her. The court's statement about her responsibility to acquaint herself with the meaning of the document was based in large part on the fact that she "executed not merely one but four instruments, all of which were read to her and whose purpose she understood." 246 Mich. at 261, 224 N.W. 359. In contrast, there is no undisputed factual allegation in Ms. Batchelor's case that the paper was obviously a legal instrument whose purpose she understood, obligating her to ascertain carefully its contents. Consequently, it is doubtful whether the Sponseller rule applies.
 
 
 66
 All of the Michigan cases citing Sponseller involve situations in which the signers clearly understood that the documents to be signed were legal instruments, and they were therefore negligent in failing to determine precisely the meaning of the contents. Pakulski v. Ludwiczewski, 291 Mich. 502, 510, 289 N.W. 231 (1939) (persons signed lease and promissory notes knowing what the documents were, but later claimed to have misunderstood the precise rights and obligations involved); Richeson v. Wagar, 287 Mich. 79, 85, 282 N.W. 909 (1938) (persons signed documents that were brought to their home by an attorney, later claiming they did not realize what the documents had stated); Horn v. Cooke, 118 Mich.App. 740, 747, 325 N.W.2d 558 (1982) (semi-literate woman who signed consent form prior to surgery argued that she did not understand arbitration clause contents; however, she had lengthy period for study and two opportunities to have the document read to her). I believe a distinction may be made under Michigan law between comprehending which rights were signed away and comprehending that rights were being signed away at all. This is especially so in the context of employment applications when marginally educated persons in desperate search of economic survival are in the job market coping with skillfully drafted and carefully considered application documents.
 
 
 67
 I would remand on this issue for further consideration. I therefore respectfully dissent from the portion of the opinion disposing of Batchelor's argument that, because she was unable to comprehend the language, she did not knowingly assent to a contract term regarding at will employment.
 
 
 
 *
 This appeal was originally heard on June 5, 1985 before a panel consisting of Judges Contie, Celebreeze and Phillips. Due to the untimely death of Judge Phillips following oral argument in this case, the appeal was rescheduled for argument and disposition before a panel