842 F.2d 330
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Henry APRAHAMIAN and Thomas A. Mee, Plaintiffs-Appellants,
v.
BETA TUBE CORPORATION, an Ohio corporation, Defendant-Appellee.
 No. 87-1021.
 United States Court of Appeals, Sixth Circuit.
 March 15, 1988.
 
 Before MERRITT and RYAN, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In November, 1982, Alpha Tube Corporation (now Beta Tube Corporation and hereinafter "Beta Tube") purchased an exclusive stock option from Henry Aprahamian and Thomas Mee to acquire Motor City Tube. All parties agree that Beta Tube promised to continue the salaries of plaintiffs Aprahamian and Mee for two and one-half years. The issue in dispute in this case is the date at which the two and one-half year period was to begin. Mee and Aprahamian argue that the salary period was to run from the date the option was exercised and the stock was purchased; Beta Tube claims that the salary period should be calculated from the time the option was executed.
 
 
 2
 Upon termination of their salary payments in April, 1985, Aprahamian and Mee filed breach of contract claims, alleging that the two and one-half year period ran from the date on which the stock was purchased, November 23, 1983, rather than on the date the option was acquired, November 3, 1982. They therefore claimed that they were entitled to one additional year of salary.
 
 
 3
 Following discovery, Beta Tube moved for summary judgment. Mee and Aprahamian then responded with their own affidavits and that of former Beta Tube employee, Richard Messmer. The district court granted Beta Tube's Motion, finding that "there was never a valid contract" because "there was never any agreement or meeting of the minds as to when the two and one-half year period would begin." The court also determined that the affidavits were directly contrary to deposition testimony and therefore should not be used to create a factual issue, relying on Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir.1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony.") (quoting Biechle v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984)).
 
 
 4
 A careful review of the deposition testimony makes it clear that the district court was correct in finding that there was not a meeting of the minds between Mee, Aprahamian and Beta Tube regarding when the two and one-half salary payment period was to commence. Appellant Mee stated in deposition that his general understanding was that the additional salary payments should run from the time the option was exercised, but admitted that there was no specific agreement on this point. For example, Mee testified:
 
 
 5
 Q. What was your understanding as to what would happen to you once Mr. Sharp began controlling Motor City?
 
 
 6
 A. There was never a clear understanding what would happen when he would begin to control it, but it was our understanding that it would last two and a half years after the agreement was signed and the option was exercised. (Emphasis added)
 
 
 7
 Mee again testified that he had some vague idea that the salary payments in question would begin when the option was exercised:
 
 
 8
 A. As I said before, there was never any discussion as to the salary continuing, I mean any question about it not continuing. That was right up front in the very beginning.
 
 
 9
 Q. What was said on that point?
 
 
 10
 A. That they would continue two and a half years after they took over the company exercising the option.
 
 
 11
 Q. Who made that statement?
 
 
 12
 A. I can't remember who made the statement but I assume Mr. Sharp, Mr. Mawer, Aprahamian and myself.
 
 
 13
 Q. Do you have any specific recollection--
 
 
 14
 A. No specific.
 
 
 15
 When questioned further, Mee was not able to answer the question concerning when he formed his general understanding about the commencement date:
 
 
 16
 Q. Is it a fair statement that you were never told by Mr. Mawer or Mr. Sharp that it would begin to run at the purchase of the stock?
 
 
 17
 A. There were several discussions on that period of beginning with myself with Mr. Mawer.
 
 
 18
 Q. Several discussions?
 
 
 19
 A. Um-hum.
 
 
 20
 Q. Okay, What is the first discussion that you recall?
 
 
 21
 A. I don't remember the dates again, but the first time that I mentioned it to him he said we'll cross that bridge when we get there.
 
 
 22
 Q. Who said that?
 
 
 23
 A. Mr. Mawer.
 
 
 24
 Q. Okay. Was this prior to or after the Option Agreement was signed?
 
 
 25
 A. Just about at that time. It was during the negotiations for this contract, for this option, but whether it was before or after, I can't remember that.
 
 
 26
 Q. Looking at the periods prior to when you signed the agreement up to the point at which you signed the option, you reached an understanding in your own mind that the two-and-a-half-year period would begin to run after the option was exercised?
 
 
 27
 A. No, I don't remember whether it was after or before this agreement that the discussions took place.
 
 
 28
 Mee then conceded in no uncertain terms that no specific agreement was entered into in the following exchange:
 
 
 29
 Q. What is your testimony on that point? Did you have any understanding as to when the two and one-half years would begin to run at the time you signed Exhibit 11 [the stock option agreement]?
 
 
 30
 A. There was never an agreement. I said one time and they said another time and it continued that way.
 
 
 31
 Q. No agreement was reached until after the option was signed on that point?
 
 
 32
 A. There has never been an agreement made. I said one time and they said another time and it continued that way.
 
 
 33
 Q. So in other words, at the time you signed the option you had no assurance that it would begin to run at the time of the purchase?
 
 
 34
 A. That's correct.
 
 
 35
 In direct contrast, Mee's affidavit states that:
 
 
 36
 Prior to the option period negotiations were conducted on several occasions between myself and Defendant's officers, namely Robert Sharp and Daniel Mawer, among others.
 
 
 37
 As a result of such negotiations, an agreement was made that, upon Defendant's purchase of Motor City Tube Co., and in consideration for my sale of such stock, I would be given a two and one-half year (2 1/2) year contract of continued employment with Motor City Tube Co.
 
 
 38
 Aprahamian similarly testified during his deposition that there was no agreement between the parties on this issue. It is apparent that Aprahamian, like Mee, had the general impression that the two and one-half year salary period should run from the time the option was exercised. This impression was derived apparently from the way Mee and Aprahamian thought it should be and not from a specific agreement between the parties. For example, the following exchange occurred during Aprahamian's deposition:
 
 
 39
 Q. You allege in your Complaint that the two and a half year period was to run from the date the option was exercised.
 
 
 40
 A. That's correct.
 
 
 41
 Q. What facts do you base that allegation upon?
 
 
 42
 A. What facts?
 
 
 43
 Q. What facts do you rely upon?
 
 
 44
 A. We still owned the company. The stock was in our name and we had personal guarantees at the bank, so while it was being directed by others, we still had personal obligations as far as guarantees.
 
 
 45
 Q. Anything else?
 
 
 46
 A. Some of the suppliers asked who owned the corporation and we told them that Mr. Mee and I still own it.
 
 
 47
 Q. Any other facts that you relied upon in claiming that the two and a half year period began running at the date of the exercise of the option?
 
 
 48
 A. We didn't sign anything to the contrary.
 
 
 49
 Q. Anything else?
 
 
 50
 A. No.
 
 
 51
 Aprahamian testified in deposition that discussions concerning the start of the salary period took place "sometime after the option was signed and when our final termination of employment took place...." Aprahamian, too, testified unequivocally that there was no agreement on the issue and gave a realistic look into what probably occurred during negotiations:
 
 
 52
 Q. So then prior to the option there was a disagreement on that issue?
 
 
 53
 A. I think so. I think we both tried to sweep it under the table.
 
 
 54
 Q. When you say both--
 
 
 55
 A. Both the Alpha group and us.
 
 
 56
 Q. So it's your testimony there was no agreement on that issue prior to the signing of the option?
 
 
 57
 A. There was no written agreement, is that what you are saying?
 
 
 58
 Q. Either way.
 
 
 59
 A. No.
 
 
 60
 Q. When you say no--
 
 
 61
 A. No, there was no written agreement or any verbal agreement. (emphasis added)
 
 
 62
 Aprahamian's affidavit directly contradicted his deposition testimony and stated that prior to signing the option agreement Beta Tube "promised" Aprahamian and Mee continued employment to commence from the date Beta Tube purchased their company.
 
 
 63
 Contrary to the comment in the dissent, we have not said that the facts are undisputed but rather that the plaintiffs' affidavits are directly at odds with their deposition testimony and therefore should not be used to create a factual issue. See Reid, supra, 790 F2d at 460. The affidavit of Richard Messmer, which Mee and Aprahamian argue also creates a genuine issue of fact, does not solve the problem. Messmer states: "Mr. Sharp and others told me that the 2 1/2 years of the employment agreement was to start with the purchase of Motor City Tube." Messmer, however, states that these conversations "occurred during 1982-1983." There is no indication as to whether these statements were made before the option was purchased (November of 1982) or later when the stock was purchased (November of 1983).
 
 
 64
 Based upon a careful review of the record and on the well-reasoned opinion of the district court, we find that no genuine issue of material fact is created by the affidavits, which are directly contrary to deposition testimony, and that there was no meeting of the minds regarding commencement of the two and one-half year payment period before the option was executed.
 
 
 65
 Accordingly, the order of the district court is AFFIRMED.
 
 
 66
 MERRITT, Circuit Judge, dissenting.
 
 
 67
 I would hold that the affidavit of Richard Messmer referred to in the majority opinion and the affidavits of plaintiffs, Thomas Mee and Henry Aprahamian, both of which are also referred to in the majority opinion, create a serious disputed issue of fact material to the breach of contract issue in this case. Messmer was the defendant's employee and appears to be an objective witness. He swore that his superiors told him that the agreement with plaintiffs was that their salary term would run from the "purchase" date. The plaintiffs swore to the same facts in their affidavits. The defendant denied this crucial fact, and thus the issue was joined. The prior deposition statements of Mee and Aprahamian--to the extent that they are inconsistent with their affidavits--also merely create a disputed issue of fact. It is for the trier of fact at trial to decide which of the two versions of fact is to be accepted. I do not understand how the majority arrives at the conclusion that the facts are undisputed or that the company's version of the facts, rather than the individual's version, is "dispositive." It is not the function of the district court on summary judgment or our function as an appellate court to decide material issues of fact which are sharply in dispute. The Seventh Amendment provides a right to trial by jury on disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2513 (1986) ("trial on affidavits" not allowed: "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge").