Sarah **BARNES**, Plaintiff–Appellant,

v.

**OTIS ELEVATOR CO.**, Defendant–Appellee.

No. 99–6649.

United States Court of Appeals, Sixth Circuit.

Jan. 18, 2001.

Before DAUGHTREY and MOORE, Circuit Judges, CARR,* District Judge.

OPINION

MOORE, Circuit Judge.

Plaintiff Sarah Barnes appeals the district court's decision granting Otis Elevator Company's ("Otis") motion for summary judgment. Barnes, a nurse's aide at a hospital, claims that she suffered injuries arising from her exposure to a noxious odor at work. Barnes alleges that the odor emanated from an elevator shaft on her floor, and that the products used that day by Otis employees to clean the elevator cables in that shaft were the source of the odor that caused her injuries.

For the reasons set forth below, we REVERSE the district court's decision granting Otis summary judgment in this case, and REMAND for further proceedings.

I. BACKGROUND

On April 8, 1996, while at work at Hardin Memorial Hospital, Sarah Barnes was exposed to an odor that made her ill. Barnes stated that the odor first smelled like "burning sassafras." Joint Appendix ("J.A.") at 161 (Barnes Dep. II). After one to two hours, the odor began to smell much more offensive, like a "very, very strong abrasive chemical." J.A. at 162 (Barnes Dep. II). In two separate depositions prior to Otis's filing of a motion for summary judgment, Barnes stated that she first noticed the noxious odors that made her ill in the morning of the day in question.[1] Yet, it is apparent from her deposition testimony that Barnes was quite confused about the timing of the various events that happened that day.

In her deposition on February 10, 1998, Barnes stated that, while she was not sure of the time, she first noticed a "bad smell" on her floor of the hospital between 11:00 and 11:30 a.m. J.A. at 141 (Barnes Dep. I). In her second deposition on May 18, 1998, however, Barnes testified on several occasions that she first noticed an unusual odor before 10:00 a.m. Barnes testified that her shift at the hospital started at 6:45 a.m. and that about an hour and a half after she arrived at work she began experiencing nausea, headaches, burning eyes, and difficulty breathing. Barnes testified that she first got sick to her stomach and vomited sometime between 9:30 and 10:30 a.m. Yet, later in her second deposition, Barnes stated that she began vomiting between two and three hours after she first noticed the smell, i.e., between 11:30 a.m. and 12:30 p.m.

Later in Barnes's second deposition, she testified that she and her co-workers searched for the source of the odor sometime before noon. They determined that the smell was coming from the elevator shaft.

Barnes reported her reaction to the fumes to the charge nurse and was instructed to wear a TB respirator to avoid the odor. With the respirator on, Barnes could no longer smell the odor. At approximately 2:30 p.m., Barnes was instructed to take the respirator off because

---

* The Honorable James G. Carr. United States District Judge for the Northern District of Ohio. sitting by designation.

1. Barnes's first deposition arose from a separate worker's compensation proceeding. In this proceeding, an administrative law judge found that Barnes had a total permanent occupational disability as a result of this injury.

it was alarming patients and family members. Barnes then became ill again, feeling dizzy, trying to catch her breath, and vomiting. At 2:50 p.m., Barnes fainted and was taken to the emergency room.

Since the day of her injury, Barnes has developed severe asthmatic reactions to products such as perfume, hair spray, and soap. Barnes had an active lifestyle before her injury, but the "permanent damage to the function of her airways" has forced her to cease many of her activities. J.A. at 136 (Dr. Qaisi Dep.). Barnes and her husband used to own a farm on which she performed many chores, including plowing, bailing hay, and tending to livestock. Now Barnes is unable to mow the grass or even work in the flower bed at her own home. She and her husband have since sold the farm.

Following Barnes's two depositions, her lawyer deposed the two Otis employees who cleaned the elevator cables at the Hardin Memorial Hospital on the day in question. In both of their depositions, the Otis employees stated that they did not begin cleaning the cables in the elevator shaft from which the noxious odor allegedly emanated until after 1:00 p.m. The Otis employees both testified that, because the elevator in question was used by the cafeteria staff to deliver lunches and collect lunch trays, they were restricted from cleaning the cables of that elevator until after 1:00 p.m., when the lunch service had concluded.

Following limited discovery, Otis filed a motion for summary judgment, claiming that Barnes could show no proof that its employees had caused Barnes's injuries, nor could she show that Otis's employees had acted negligently. In its summary judgment motion. Otis noted the obvious timing problem in Barnes's attempt to hold Otis liable. While Barnes had testified on two prior occasions that the fumes that made her ill began affecting her between 9:30 and 11:30 a.m., Otis's employees claimed that they did not begin their work on the elevator until after 1:00 p.m.

In apparent recognition of this factual inconsistency, Barnes filed an affidavit with her response to Otis's motion for summary judgment stating that she believed her memory of the events was "mistaken." and that "[i]t is possible that all these events took place in a short period of time, beginning after lunch around 1:00." J.A. at 143 (Barnes Aff.). Barnes explained that her memory of what happened on the day in question was unclear. She attributed some of her memory problems to her impaired physical condition on the day of, and the weeks following, the injury, to the medication she was taking for her condition following the injury, and to the fact that she "was not watching the clock as these things happened." J.A. at 142–43 (Barnes Aff.).

The district court, relying on Sixth Circuit precedent, refused to give any weight to the Barnes affidavit in granting Otis's motion for summary judgment. The court relied on both Barnes's deposition testimony that she became ill from the odor on the morning of April 8, 1996, and the Otis employees' testimony that they did not begin cleaning the elevator's cables until after 1:00 p.m., in holding that the Otis employees could not have been the source of the odor in question. Barnes's appeal to this court followed. Barnes now argues that the district court should have given her affidavit weight in light of her previous conflicting deposition testimony regarding when she first noticed the odor, and that the remainder of the deposition testimony in this case creates a genuine issue of material fact as to whether her injuries were caused by Otis's negligence.

## II. ANALYSIS

This court reviews de novo a district court's decision to grant summary judgment. *Thomas v. United States,* 213 F.3d 927, 929 (6th Cir.2000). In a diversity case such as this one. Fed.R.Civ.P. 56 is the applicable provision for determining the outcome of a motion for summary judgment. *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 459 (6th Cir.1986). The moving party, Otis, has the burden of establishing that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. *City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 250 (6th Cir.1994). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, if there is not sufficient evidence to allow a jury to find, by a preponderance of the evidence, in favor of Barres in her tort action, then summary judgment must be granted in favor of Otis. *See id.* at 249. In reviewing the district court's decision to grant summary judgment, this court must view all evidence in the light most favorable to the non-moving party. *Thomas,* 213 F.3d at 929.

This circuit has consistently held that, following an opposing party's motion for summary judgment, a party may not create an issue of fact by submitting an affidavit that contradicts her prior deposition testimony. *Farrell v. Auto. Club,* 870 F.2d 1129, 1131–32 (6th Cir.1989); *Reid,* 790 F.2d at 459–60; *Biechele v. Cedar Point. Inc.,* 747 F.2d 209, 215 (6th Cir. 1984). Therefore, we do not consider Barnes's post-deposition affidavit.

Wholly apart from Barnes's subsequent affidavit, an examination of Barnes's deposition testimony shows that she was indeed confused as to the timing of many events that day. The first inconsistency concerns when Barnes first noticed the foul odor. In her deposition on February 10, 1998, Barnes stated that, while she was not sure of the time, she first noticed a "bad smell" between 11:00 and 11:30 a.m. J.A. at 141. In her second deposition, however, she repeatedly stated that she first noticed an unpleasant odor before 10:00 a.m.

Even within her second deposition, Barnes's testimony is rife with inconsistencies as to timing. Barnes testified that she first noticed the odor of burning sassafras at approximately 9:30 or 9:45 a.m. Yet, shortly thereafter, she stated that she became ill about an hour-and-a-half after she arrived at work at 6:45 a.m. which would mean approximately 8:15 a.m. This is earlier than she ever testified that she first noticed the odor. Barnes also testified that she did not have any breathing difficulties before noon, but she later stated that her breathing difficulties began sometime between 10:00 and 10:30 a.m.

Barnes testified that she first vomited between 9:30 and 10:30 a.m., yet she later stated that she did not vomit until two to three hours after she first noticed the smell. If, as Barnes testified, she first noticed the smell at approximately 9:30 a.m., then this would mean she first vomited sometime between 11:30 a.m. and 12:30 p .m. Barnes openly acknowledged in her second deposition that she was confused as to when she first vomited, as well as regarding the timing of various events in general, stating: "I have no idea. Probably two, maybe two hours, two or three hours afterwards. It was so fast and it's just so much happened and it boggled my brain too. So, I mean, I—I don't regulate—recollect that day extremely well" J.A. at 189 (Barnes Dep. II).

The district court relied heavily on both Barnes's deposition testimony that she became ill from the odor on the morning of April 8, 1996, and the Otis employees' testimony that they did not begin cleaning the elevator's cables until after 1:00 p.m., in holding that the Otis employees could not have been the source of the odor in question. Yet, viewing the facts in the light most favorable to Barnes, not only is it clear that she was confused as to the timing of the odors and her consequent illness, but also the deposition testimony shows that, regardless of when Barnes began to smell the fumes and get sick, there is a genuine issue of material fact regarding whether Otis's employees were working in the elevator shaft at the time.

An important piece of testimony that the district court did not address is Barnes's statement that the odor she noticed first smelled like burning sassafras, and that, after searching for the source of the smell, she noticed that it was coming from the elevator shaft in which the Otis employees were working that day. Dr. John Todhunter, a scientist who had previously analyzed the makeup of Simple Green, the cleaning product Otis's employees claimed to be using that day, testified that the ingredient that gives Simple Green its distinctive odor is a "synthetic sassafras scent." J.A. at 268 (Dr. Todhunter Dep.). Barnes's specific description of an odor as peculiar as sassafras, along with the Otis employees' testimony that they were using the sassafras-scented Simple Green to clean the elevator cables that day, appears to create a genuine issue of material fact as to whether the Otis employees were working on the elevator at the time Barnes began to get ill. The question, then, is whether Otis's employees were using anything other than Simple Green to clean the elevator's cables.

Barnes states in her brief that the odor of Simple Green was not the cause of her illness. In her deposition. Barnes testified that while the odor first smelled like burning sassafras, after one to two hours, the odor began to smell much more offensive, like a "strong abrasive chemical." J.A. at 162 (Barnes Dep. II). Barnes alleges that Otis's employees were using something else in addition to Simple Green to clean the elevator cables. Other hospital employees working with Barnes had noticed the chemical-like smell in their area of the hospital that day. Felicia Evans, a secretary who worked with Barnes and whose work space was near the elevator, testified that she smelled a chemical-like aroma emanating from the elevator shaft. After being exposed to Simple Green during her deposition. Evans stated that the odor she noticed in the hospital did not smell like Simple Green. Anita Miller, an assistant unit manager at the hospital who worked with Sarah Barnes, also testified that she smelled fumes on their floor of the hospital, describing them as "pungent," "burning," and "irritating." J.A. at 58 (Miller Dep.). Miller also was exposed to Simple Green during her deposition, and she, too, testified that the fumes to which she was exposed in the hospital were much more irritating than the smell of Simple Green.

After the hospital employees noticed the fumes, Evans called the hospital's maintenance staff to have them further investigate the problem. Arthur Thomas Blair responded to the call. Blair also noticed the fumes in the air on Barnes's floor. The staff told him that the fumes were strongest by the elevator, so Blair went down to the machine room to talk to the Otis employees about the problem. Blair knocked on the elevator doors, and one of the Otis employees came out, announcing to Blair that they had just finished their cleaning. Blair testified that he could

smell the same fumes when talking with the Otis employees in the machine room that he had smelled on Barnes's floor.

Viewing the facts in the light most favorable to Barnes, as we must, it appears that an irritating chemical smell was emanating from the elevator shaft during the time in which the Otis employees were working in that shaft. The district court stated that the Otis employees' testimony that they only used Simple Green to clean the elevator cables was uncontradicted in this case. However, the fact that witnesses smelled chemical odors dissimilar to the aroma of Simple Green emanating from the elevator shaft during the time in which the Otis employees were cleaning the cables creates a genuine issue of material fact as to whether the Otis employees' testimony is true.

Barnes's Res Ipsa Loquitur Claim

■■■ Barnes argues that the doctrine of res ipsa loquitur creates an inference that Otis was negligent in this case. The doctrine of res ipsa loquitur "simply recognizes that as a matter of common knowledge and experience[,] the very nature of an occurrence may justify an inference of negligence on the part of the person who controls the instrumentality causing the injury." *Bell & Koch, Inc. v. Stanley*, 375 S.W.2d 696, 697 (Ky.1964). Res ipsa loquitur is inapplicable "where the existence of negligent acts is not more reasonably probable and where the proof of occurrence, without more, leaves the matter resting only to conjecture." *Helton v. Forest Park Baptist Church*, 589 S.W.2d 217, 219 (Ky.Ct.App.1979).

■■■ Under Kentucky tort law, three requirements are needed to invoke the doctrine of res ipsa loquitur and, thus, create an inference of negligence on the part of Otis: 1) the instrumentality, in this case any cleaning products used in the elevator shaft, must be under·the control or man-

agement of Otis; 2) "the circumstances, according to common knowledge and experience, must create a clear inference that the accident would not have happened" had Otis not been negligent; and 3) Barnes's injury must have resulted from the accident. *Helton*, 589 S.W.2d at 219.

1. Instrumentality Must Be in Otis's Control

■■■ "Under Kentucky law, the doctrine of res ipsa loquitur is inapplicable where the instrumentality producing the injury or damage is unknown or is not in the exclusive control of the defendant." *Id.* While the requirement of "exclusive control" is cited often across the jurisdictions, it should not be given a "strict and literal application." William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 39, at 249 (5th ed.1984). *See also* 4 Fowler V. Harper et al., The Law of Torts § 19 .7, at 45–46 (2d ed.1986); Restatement (Second) of Torts § 328D, at 161 (1965). Instead, "[t]he logical basis for this requirement is simply that it must appear that the negligence of which the thing speaks is probably that of defendant and not of another." 4 Harper et al., *supra*, § 19.7, at 45. As the Kentucky courts have stated, plaintiffs are "not required to exclude all other possible conclusions beyond a reasonable doubt. . . . [Rather,] they [are] required to make out a case from which the jury might have reasonably concluded that, more probably than not, the injury occurred due to [the defendant's] negligence." *Turner v. Newport Bd. of Educ.*, —— S.W.2d ——, ——, No.1999–CA–001766–MR, 2000 WL 1364429, at \*5 (Ky.App. Sept. 22, 2000) (citing Restatement (Second) of Torts § 328D). The deposition testimony in this case would allow a jury reasonably to conclude that Barnes's injury occurred due to Otis's negligence.

In this case, several hospital employees testified that a strong, irritating odor was emanating from the elevator shaft, and Blair's testimony shows that the Otis employees were cleaning the elevator cables at this time. Blair further testified that, when talking to the Otis employees, he could smell the same fumes that he had just smelled on Barnes's floor. In addition, Barnes's testimony that she smelled burning sassafras before the odor changed to that of an "abrasive chemical" indicates that the Otis employees were cleaning the elevator shaft from the time Barnes first began noticing the strange odors until later in the day when Blair spoke with them and told them there was a problem with the fumes. Furthermore, at oral argument. Otis's attorney stated that, while there was more than one elevator on the hospital floor on which Barnes was working, the hospital employees testified that the offensive fumes were emanating only from the shaft in which Otis's employees were working. The foregoing testimony is sufficient to create a genuine issue of fact as to whether Otis was in control of the source of the fumes that caused Barnes's injuries.

### 2. Barnes's Accident Could Not Have Happened But For Otis's Negligence

The facts in this case create a genuine issue of material fact as to whether noxious fumes would have been released had Otis not been negligent. Several employees on Barnes's floor spoke of the irritating and pungent odor that had flooded their work space on the day in question. The smell was so irritating that a doctor was forced to violate the hospital's own policy in opening the windows to get fresh air. Several employees wore TB masks until they were told it was scaring the patients and their families. A genuine issue of fact exists as to whether the release of these irritating fumes in an unventilated area constituted a negligent act on the part of Otis.

### 3. Barnes's Injury Must Have Resulted from the Accident

The deposition testimony demonstrates that a genuine issue of material fact exists as to whether Barnes's injury resulted from the release of these fumes. We need look no further than the testimony of Dr. Ghazi Qaisi, the doctor who treated Sarah Barnes following her injury. In his testimony, Dr. Qaisi stated:

> I believe that this woman has a permanent damage to the function of her airways from the exposure to the chemical. And that is by virtue of the fact that she never felt well for one single day and she never could live without using at least ten medications in one day to be able to breathe.

J.A. at 136. The doctor did not agree with questions posed to him in his deposition that Barnes's reaction to this chemical may have been the result of a prior disease, stating that if this was true, Barnes would have had similar reactions in the past. Instead, Dr. Qaisi stated that "she never had a similar episode like this. This was a totally different episode after the exposure to the chemical." J.A. at 131.

Based on the deposition testimony in this case, a reasonable jury could conclude, by a preponderance of the evidence, that Otis was negligent in cleaning the hospital's elevator cables, and that this negligence caused Barnes's injuries.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision granting Otis summary judgment in this case,

and REMAND the case for further proceedings.