Suzan SALIM, Plaintiff,

v.

**MGM GRAND DETROIT, LLC, Defendant.**

**No. 01–CV–73988–DT.**

United States District Court, E.D. Michigan, Southern Division.

Oct. 29, 2002.

Thomas W. Elkins, Waterford, MI.

Louis Theros, Detroit, MI, Rick Haberman, Detroit, MI.

## *OPINION*

DUGGAN, District Judge.

Plaintiff filed this action against her former employer asserting violations of the Americans with Disabilities Act and Michigan's Persons with Disabilities Civil Rights Act. In addition, Plaintiff has brought a claim of slander. The matter is currently before the Court on Defendant's motion for summary judgment. A hearing was held on September 19, 2002. For the reasons set forth below, Defendant's motion for summary judgment shall be granted.

### Background

Plaintiff Suzan Salim was employed as a card dealer by Defendant MGM Grand Detroit from February 2000 to October 2000. Plaintiff, a diabetic, was discharged by Defendant MGM after she altered and submitted a "return to work" form from her doctor. Prior to her discharge, Plaintiff made repeated requests to change her work schedule from the night shift to the day shift. She requested the change because she thought she would be better able to control her diabetes if she worked during the day. She made verbal requests to her shift manager at the time, Becky Meade, and also submitted letters from four doctors in support of her requested accommodation. Plaintiff's requests were denied.

Plaintiff is now bringing suit under both the Americans with Disabilities Act of 1990 ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") alleging failure to accommodate and discriminatory discharge. In addition, Plaintiff has brought a slander charge.

There are three shifts available to dealers employed with Defendant MGM. The

sunrise shift is from 4 a.m. to noon, the morning shift is from noon to 8 p.m. and the swing shift is from 8 p.m. to 4 a.m.. Applicants are asked to designate their top two shift choices. Plaintiff's first choice was the morning shift and her second choice was the swing shift. (Salim Dep. at 45–46). Plaintiff testified that during the interview, she told the interviewer she was diabetic and that she preferred to work in the morning because she could not work at night. (Salim Dep. at 36). According to Plaintiff, the interviewer replied, "[w]e'll do the best we can." (Salim Dep. at 36).

While working at night for Defendant MGM, Plaintiff began to experience several symptoms during her shift including stomach cramps, sweating, and diarrhea. (Salim Dep. at 77–82). According to Plaintiff, she sometimes experienced the episodes three or four times in the same shift. (Salim Dep. at 97). These symptoms caused Plaintiff to leave work three times. (Salim Dep. at 83).

During the course of her employment, Plaintiff submitted four letters from treating physicians stating essentially that Plaintiff would be better able to control her diabetes if she were able to work during the daytime. One such letter was from Dr. Wafie Roumayah. During his deposition, Dr. Roumayah explained how Plaintiff's symptoms were related to her work hours.

Q: What exactly was she complaining about with respect to working at night?

A: That she cannot take good care of herself because night shift disturb her [sic] and she gets upset and she cannot take her medication regularly and daytime she cannot sleep [sic] and she cannot control her diabetes well and she gets stomach cramps and I gave her this.

Q: What about working at night would affect stomach cramps?

A: In some people working at night will cause them headache, generalized fatigue, tiredness, abdominal cramps. They don't care about controlling their diabetes because they are fatigued during the daytime. So obviously daytime work for them would be better because they can take better care on [sic] themselves than during the night shift.

Q: Do the fatigue and the stomach cramps have anything to do with the diabetes necessarily or would that be true of anybody working the night shift?

A: It differs from person to person.

Q: So it's not necessarily connected to diabetes?

A: It could be, it could be not [sic].

(Roumayah Dep. at 52–53).

Plaintiff was terminated from Defendant MGM Grand in October 2000. Defendant MGM offers as its basis for termination an altered return to work form submitted by Plaintiff. (Def.'s Br. at 7). Specifically, Defendant alleges that Plaintiff altered the note to read "August 28" instead of "August 26."(Def.'s Br. at 7). Plaintiff testified that although she did alter the note, she had the permission of the nurse in the doctor's office at the time to do so. (Salim Dep. at 140).

### Standard of Review

Rule 56 (c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment when "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

## Discussion

At the hearing on September 19, 2002, defense counsel argued that, with respect to Plaintiff's claims for wrongful termination in violation of the Americans With Disabilities Act ("ADA") and Michigan's Persons With Disabilities Civil Rights Act ("PDCRA"), Defendant is entitled to summary judgment because: 1) Plaintiff is not "disabled" within the meaning of the ADA or PDCRA; and 2) even if Plaintiff were "disabled," her disability was not a factor in Defendant's decision to terminate her employment.

Defendant contends that it is entitled to summary judgment with respect to Plaintiff's failure to accommodate claim because: 1) Plaintiff is not "disabled" within the meaning of the ADA and PDCRA and therefore is not entitled to an accommodation; 2) even if Plaintiff were "disabled", the accommodation was not reasonable because there was no causal relation between her disability and the requested accommodation; and 3) the accommodation was unreasonable in light of Defendant MGM's seniority system.

With regard to Plaintiff's claim of slander, Defendant asserts that it is entitled to summary judgment because the claim is based entirely on hearsay.

### I. Plaintiff's Wrongful Termination Claim

### A. Whether Plaintiff is "Disabled" Under the ADA

 Under the ADA, "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (1995). "Substantially limits" means an inability to perform, or a significant restriction on the ability to perform as compared to the average person in the general population. *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 361 (3rd Cir.2000)(citing 29 C.F.R. § 1630.2(j)(1)(i)-

(ii)(1999)). "Major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working". 29 C.F.R. § 1630.2(i)(1995). Michigan courts rely on the ADA for resolving cases under the PDCRA as the statutory language is the same. *Smith v. Chrysler Corp.*, 155 F.3d 799, 804 (6th Cir.1998).

In this case, Defendant argues that even though Plaintiff has diabetes, her major life activities are not substantially limited by her condition. Plaintiff asserts that diabetes does render her disabled under the ADA because of the symptoms she experienced while working at MGM (stomach cramping, diarrhea, fatigue), an inability to do household chores, and ulcers on her legs that impair her ability to walk when they occur.

Plaintiff asserts that her major life activities of doing housework, working, and walking are substantially limited by her diabetes. Even if this Court accepts that housework, as it relates to ones ability to care for oneself, is a major life activity, Plaintiff admitted in her deposition that she did not stop doing housework until after she was terminated:

Q: When did you stop doing normal housework?

A: Actually and honestly that was after I got fired.

Q: Okay.

A: I got real hurt bad inside, that's why.

Q: So before you got fired though, you were doing your normal housework?

A: Of course. I was happy, I got a beautiful job.

Q: Are there any other activities that you've had to give up because of your diabetes?

A: NOT BECAUSE I'M DIABETIC. I MEAN I GAVE UP EVERYTHING, AND MY SUGAR GOT WORSE, AND I CAN'T—I MEAN EVEN OUTSIDE I'M NOT GOING LIKE BEFORE, JUST KEEP STAYING INSIDE.

Q: So you're telling me up until you got fired, your life was pretty normal?

A: Yes.

(Salim Dep. at 75).

■ Plaintiff also maintains that she is substantially limited in the major life activity of working. When the major life activity of working is under consideration, the Supreme Court stated that, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Further, the Supreme Court noted, "[t]o be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* at 2139.

In this case, Plaintiff has not identified a broad class of jobs that she is unable to perform because of her diabetes. After her termination from MGM, Plaintiff spent one week as a cashier at Farmer Jack and left because she could not get enough hours. (Salim Dep. at 13). Also, Plaintiff worked as a hair stylist at BoRics and quit because again, she wanted more hours and they did not offer benefits. (Salim Dep. at 14). When asked during her deposition whether diabetes prevented her from doing any type of work, Plaintiff responded only that she would not be able to lift heavy things over twenty pounds. (Salim Dep. at 28).

Plaintiff has presented no evidence that diabetes precludes her from performing a broad class of jobs, thus raising no genuine issue of fact with regard to whether she is substantially limited in the major life activity of working.

■ Finally, Plaintiff argues that she is substantially limited in the major life activity of walking. Courts look at several factors when determining whether an impairment substantially limits a major life activity. "The determination of whether an impairment substantially limits a major life activity requires a consideration of '(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996)(citing 29 C.F.R. § 1630.2(j)(2)(1995)). The court also noted that, "[g]enerally, short-term, temporary restrictions are not substantially limiting." *Id.*

Plaintiff notes in her response brief that she has ulcers on her legs due to diabetes and that "when such occur" her ability to walk is impaired. (Pl.'s Resp. at 13). Plaintiff gives no indication of how often the ulcers occur or the nature of the impairment when the ulcers do occur. Nor does Plaintiff discuss whether the ulcers will have any permanent or long-term effect on her ability to walk.

It is clear that minor impairments with regard to the major life activity of walking do not constitute a disability under the ADA. For example, in *Kelly v. Drexel University,* the Third Circuit affirmed a district court's granting of summary judgment for the defendant because the plaintiff was not disabled under the ADA. *Kelly,* 94 F.3d 102 (3rd Cir.1996). In *Kelly,* the Plaintiff testified in his deposition that he could not walk more than a mile and could not jog. When climbing stairs he had to walk slowly and hold onto the rail.

In addition, his physician submitted the following statement:

> Mr. Kelly has been under my care since December of 1987, for severe problems with his right hip joint.
>
> The diagnosis on this patient was severe post-traumatic degenerative joint disease of the right hip and protrusio acetabulum of the right hip joint.
>
> The patient's condition causes him great difficulty in walking around.

*Id.* at 106.

In this case, Plaintiff offers no evidence creating a genuine issue of fact as to whether she is substantially limited in the major life activity of walking. She has not described her walking impairment at all in the record. Therefore, because Plaintiff has failed to create an issue of fact regarding the substantial impairment of *any* major life activity, summary judgment for Defendant MGM is proper on the ADA and PDCRA claims.

**B. Whether Defendant's Reason For Termination Was Pretext For Disability Discrimination**

■ Assuming that Plaintiff is disabled, Defendant argues that there is no evidence to support Plaintiff's claim that her disability played any part in the decision to terminate her. Defendant contends that the decision to terminate her was based on the fact that she submitted an altered return to work form. Plaintiff submitted a return to work form dated August 22, 2000 to Becky Meade, her shift manager at the time. The return to work date was altered to read "August 28" instead of "August 26." Becky Meade testified that the document looked suspicious and she took it to cast relations for an investigation. (Meade Dep. at 53). Perita Ferguson conducted

the investigation by calling the doctor's office and in a sworn declaration stated:

> I did in fact call Dr. Rodner's office and spoke with his office assistant. I also faxed a copy of the note that Ms. Meade had given me to Dr. Rodner's office. Subsequently, Dr. Rodner's office assistant informed me that Ms. Salim had been authorized to return to work on August 26th, not August 28th. She also informed me that it is office policy to make out an entirely new note when a change is made. Neither the doctors nor their office assistants write over previously entered information, as was the case with the note given to Ms. Meade.

(Ferguson's Sworn Declaration, Def.'s Br. Exhibit J). As a result of this investigation, Plaintiff was discharged under MGM Grand Detroit Code of Conduct Number 14 which prohibits "making false, fraudulent or malicious statements to or about other cast members, a guest, MGM Grand Detroit or any of its facilities."

Plaintiff does not dispute that she altered the form. Plaintiff also acknowledges that the record supports the fact that Plaintiff was not authorized by the physician's office to alter the form.[1] However, Plaintiff contends that, in fact, the altered form was not the true reason for the termination; rather that it was merely pretext for the real reason, which was Plaintiff's disability. However, in this Court's opinion, Plaintiff's evidence of pretext is not persuasive.

First, Plaintiff attempts to show pretext by stating that "MGM treated her numerous requests for accommodation with contempt. She was in essence told 'how dare you ask for a favor from MGM.'" (Pl.'s Resp. at 18). Plaintiff testified that upon

---

1. Plaintiff, however, believes that it was permissible for her to make the change in the form. Plaintiff's counsel also acknowledged at the hearing on September 19th, that the submission of the altered form *could* be justification for terminating her.

learning of her shift assignment she asked her shift manager, Becky Meade, to change her hours. (Salim Dep. at 50). Allegedly, Meade responded by pointing her finger near Plaintiff's eye and saying "[y]ou working [sic] for our favorite [sic], you don't work for your favorite [sic]." (Salim Dep. at 50). This is not persuasive evidence of pretext.

First, this statement was made over seven months prior to Plaintiff's discharge. In addition, there is no evidence that Becky Meade played any role in MGM's decision to terminate Plaintiff. Perita Ferguson conducted the investigation of the altered return to work form, informed Meade that "we would move to separation" and asked Meade to prepare the paperwork. (Meade Dep. at 61). Meade acknowledged that in this case she acted as the "perennial gopher" only doing what Ferguson asked her to do. (Meade Dep. at 62). According to the Sixth Circuit, allegedly discriminatory remarks not attributable to the ultimate decision maker do not create an issue of fact as to whether the legitimate reason for discharge was pretextual. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990).

Next, Plaintiff argues that the discharge was pretextual because an unidentified employee would not let Plaintiff store her insulin in a refrigerator at work. (Pl.'s Resp. at 18). Again, this incident is not probative on the issue of pretext because Plaintiff has failed to demonstrate that the employee who made this statement played any role in MGM's decision to terminate her.

Plaintiff also argues that the delay between her submission of the altered form and her discharge shows pretext. According to Perita Ferguson, the MGM who conducted the investigation of the altered form, the three month delay between the submission of the form and Plaintiff's termination was due to the fact that Ferguson

had a fourteen day absence during that period and at the time was in charge of 2,800 employees as a Cast Relations Advisor. (Ferguson's Sworn Declaration, Def.'s Br. Exhibit J).

Finally, Plaintiff points out that at the time of her discharge, Defendant MGM hired 62 new dealers. Again, it is unclear how this fact establishes that MGM's decision was not actually motivated by the fact that Plaintiff altered a doctor's note but was motivated by the fact that Plaintiff has diabetes. In sum, Plaintiff has not produced sufficient competent evidence to refute Defendant's claim that it discharged Plaintiff because of the altered note and to meet Plaintiff's burden to create a question of fact as to whether Defendant discharged Plaintiff because of a disability.

## II. Plaintiff's Failure to Accommodate Claim

Under the ADA, an employer may not discriminate against an "individual with a disability" who with "reasonable accommodation," can perform the essential functions of the job. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 1519, 152 L.Ed.2d 589 (2002)(citing 42 U.S.C. §§ 12112(a) and (b)). However, if an employer can show that the accommodation would "impose an undue hardship" there is no duty to accommodate. 42 U.S.C. §§ 12112(a) and (b).

Defendant MGM argues that Plaintiff's failure to accommodate claim must fail because Plaintiff is not disabled as defined by the ADA and PDCRA. In the alternative, Defendant argues that if Plaintiff were disabled, it had no duty to accommodate her because the requested accommodation was not reasonable because there was no causal connection between the accommodation, i.e., working days, and diabetes. In addition, the requested accommodation was unreasonable because it would require

Defendant MGM to accommodate Plaintiff in contravention of its seniority system.

As discussed previously, because Plaintiff has failed to create a genuine issue of fact as to whether she is disabled under the ADA and PDCRA, she has failed to show that Defendant was under a duty to accommodate her. Therefore, the Court finds it unnecessary to examine whether the requested accommodation was reasonable.

### III. Plaintiff's Slander Claim

■ Plaintiff alleges that Defendant made defamatory remarks about her to the Michigan Gaming Commission (Plaintiff's Sworn Declaration at 12). Specifically, Plaintiff alleges that "MGM informed the Michigan Gaming Commission that she was fired based upon acts of fraud." (Pl.'s Resp. at 19). Plaintiff contends that this alleged statement is false because after a hearing for unemployment benefits, an administrative law judge found that Plaintiff's conduct was "not wrongful." (Pl.'s Resp. at 11).

Defendant argues that the defamation claim must fail because Plaintiff has produced no admissible evidence that the statements were made. (Def.'s Br. at 18). In addition, Defendant argues that the statements were privileged. (Def.'s Br. at 18).

Under Michigan law, there are four elements to a defamation action: 1) a false and defamatory statement; 2) an unprivileged publication to a third party; 3) fault amounting to at least negligence on the part of the publisher; and 4) special harm or actionability of the statement irrespective of special harm. *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 308 (6th Cir.1998). An employer has a qualified privilege to communicate information regarding a former employee to a prospective employer. *Gonyea v. Motor Parts Fed. Credit Union*, 192 Mich.App. 74, 79,

480 N.W.2d 297 (1991)(citing *Moore v. St. Joseph Nursing Home Inc.*, 184 Mich.App. 766, 768, 459 N.W.2d 100 (1990)). Plaintiff may overcome this qualified privilege by showing that the statements were made with actual malice. *Gonyea*, 192 Mich. App. at 79, 480 N.W.2d 297.

Plaintiff has offered no admissible evidence showing that MGM made defamatory statements about her. Plaintiff admitted that she has no personal knowledge of the alleged statements made by Defendant MGM to the Michigan Gaming Commission. Instead, Plaintiff relies on hearsay. During her deposition, Plaintiff initially stated that her husband called the Gaming Commission:

A: Actually I called 1–900, and they said there is a—shows on the license in the state gambling that you committed a fraud. I was fired because of fraud documents. Same as Motor City.

Q: Now, let me get this straight. You called a 1–900 number?

A: Yes, my husband did.

Q: And what was the 1–900 number connected to?

A: Okay, my husband called MGM first, okay, and asked like to verify this employee, okay, because I was going to work over his friend's store, so he wanted to know my record behind [sic].

So he called MGM, they said you have to dial 1–900 and a number to ask for this person, we cannot verify that information. So when he called, he told my husband-they told him she was fired of fraud documents [sic].

(Salim Dep. at 25–26).

Later on in the deposition, when asked again about the "1–900" number Plaintiff again admitted that she has no personal

knowledge of the statements and that her husband's friend called.

Q: Have you ever called this 900 number yourself?

A: No, I can't. I mean my name, I'm the employee. I mean they not going to give me anything about it [sic].

Q: Do you know the number offhand?

A: No, not with me.

Q: And tell me again the name of the person who did call the 900 number.

A: His name is Kassy. K–A–S–S–Y.

Q: And his last name?

A: A–L–L–O–S.

Q: Has anybody else ever told you that they were told you had falsified a document?

A: Nobody gave me the answer to work with them.

Q: So Mr. Kassy Allos is the only person you heard information from?

A: Yes.

Q: Other than what you've just talked about, is there any other instance where you believe someone at MGM has told an untruth about you or lied about you?

A: I'm sorry, I don't understand. What do you mean other?

Q: Has there ever been—other than what we've just talked about, this 900 number—

A: Yes.

Q: —is there any other time when you believe MGM has lied about you?

A: Other than what we talk now [sic]?

Q: Yes, other than that.

A: I don't know.

(Salim Dep. at 191–192).[2]

Under F.R.C.P. 56(c), "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Here, Plaintiff is testifying to something of which she has no personal knowledge. She has never called the Gaming Commission and although Plaintiff attributes her failure to find work in another casino to the alleged statements made by Defendant MGM, no employer has ever told Plaintiff that they received information about fraud from Defendant MGM. (Salim Dep. at 192–193). In addition, Plaintiff relies on hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Here, Plaintiff is offering the statements of Mr. Allos to her husband to show that Defendant MGM made defamatory statements about her to the Gaming Commission.

According to the Sixth Circuit, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of

---

**2.** In an undated sworn declaration submitted with her Response Brief, Plaintiff contradicts this deposition testimony by stating that she called the Gaming Commission:

> I attempted to obtain work at both of the other casinos in Detroit. I was not accepted, and no reason was given. Consequently, I called the Michigan Gaming Commission, and was informed that I could not be hired because MGM reported that I had submitted fraudulent documents and until

this record was removed, I was not eligible to be hired by a casino.

(Plaintiff's Sworn Declaration at 12). Even this contradiction is not enough to create an issue of fact. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears Roebuck*, 790 F.2d 453, 460 (6th Cir.1986).

material fact." *Sperle v. Michigan Dep't of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002) (citation omitted). As Plaintiff has offered no other evidence of the defamatory statements, summary judgment for Defendant is proper on the defamation claim.

### Conclusion

For the reasons set forth above, Defendant's motion for summary judgment shall be granted as to all claims. A Judgment consistent with this Opinion shall issue.